# OREGON & CALIFORNIA RAILROAD COMPANY *v.* UNITED STATES.

CERTIFICATE FROM AND CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 679.   Argued April 23, 26, 27, 1915.—Decided June 21, 1915.

Where there are doubts whether a clause be a covenant or condition courts will incline against the latter; and as a general principle a court of equity is reluctant to lend its aid to enforce a forfeiture.

The provisos in the Land Grant Act of July 25, 1866, as amended June 25, 1868, and April 10, 1869, and in the Act of May 4, 1870, to the effect that the lands granted must be sold by railroad com-

panies only to actual settlers in quantities not exceeding 160 acres to each and at a price not exceeding two dollars and fifty cents per acre, are not conditions subsequent, the violation of which result in forfeiture of the grants, but are covenants which are enforceable. This suit, under such circumstances, becomes one to enforce the covenants and not to annul the patents.

The fact that the actions of the railroad companies in connection with the lands granted were known to the government officials and that no action was taken by the Government in regard thereto does not amount to an estoppel against the Government so that it cannot now enforce the covenants.

Acts of Congress granting lands are laws as well as grants and are operative until repealed; the fact that the conditions imposed in the grant were not applicable to the character of the lands furnishes no excuse for antagonistic action, even though it might justify non-action pending further legislation.

The delay in the assertion of a right is not conclusive against its existence, although there may be argument in it.

Under the acts involved there was a complete grant to the railroad company with power to sell limited only as prescribed, and cross complainants and intervenors who have set up alleged rights in the lands by reason of settlement thereon cannot sustain their claims thereto. Nor can there be an absolute right to purchase and settle on lands where there is no compulsion to sell.

The words "actual settlers" indicate no particular individuals; and the uncertainty of the expression prevents any individual from being a *cestui que trust* to enforce the condition of the statute.

In construing land grant statutes the courts cannot, even at the instance of the Government, give a greater sanction to them than Congress intended; nor can the courts give to any parties rights which the statutes did not confer upon them.

As the conditions contained in the grant are enforceable, the railroad company is enjoined from further violating them, but as conditions have changed since the grant was made, the company is further enjoined from making any disposition of the land or cutting or removing the timber thereon until Congress shall have a reasonable opportunity to provide for their disposition by legislation, and in case after six months Congress shall not have acted, the company may apply to the District Court for a modification of the decree.

THIS writ brings up for review a decision of the United States District Court for the District of Oregon decreeing

the forfeiture of the unsold portion of certain lands granted by Congress to certain railroad companies and quieting the title of the United States thereto.

In consequence of a memorial presented to it, Congress, on April 30, 1908, adopted a joint resolution which authorized and directed the Attorney General of the United States to institute and prosecute any and all suits in equity, actions at law, or other proceedings, to enforce any rights or remedies of the United States arising and growing out of either of the following acts of Congress, to-wit: "An act granting lands to aid in the construction of a railroad and telegraph line from the Central Pacific Railroad in California, to Portland, in Oregon," approved July 25, 1866, c. 242, 14 Stat. 239, as amended by the acts approved June 25, 1868, c. 80, 15 Stat. 80, and April 10, 1869, c. 27, 16 Stat. 47, and "An act granting lands to aid in the construction of a railroad and telegraph line from Portland to Astoria and McMinnville, in the State of Oregon," approved May 4, 1870, c. 69, 16 Stat. 94.

The Attorney General was empowered to assert all rights and remedies existing in favor of the United States, including the claim on behalf of the United States that the lands granted by such acts, or any part of the lands, have been or are forfeited to the United States by reason of any breaches or violations of the terms or conditions of either of such acts which may be alleged or established in such suits, actions or proceedings.

The resolution declared that it was not intended to determine the right of the United States to any such forfeiture or forfeitures, but to fully authorize the Attorney General to assert on behalf of the United States, and the court or courts before which such suits, actions or proceedings might be instituted or pending to entertain, consider and adjudicate, the claim and right of the United States to such forfeiture or forfeitures, and, if found, to enforce the same. Res. 18, 35 Stat. 571.

Being so authorized, the United States brought this suit as complainant against the Oregon & California Railroad Company, the Southern Pacific Company, Stephen T. Gage (individually and as trustee), the Union Trust Compnay (individually and as trustee), John L. Snyder, and certain others as defendants, to declare forfeited to the United States lands of the Oregon & California Railroad Company aggregating 2,300,000 acres which inured to the predecessors in interest of the company under the acts of Congress referred to in the resolution.

The bill set forth the acts of Congress and alleged that it was expressed that neither the amendatory act of April 10, 1869, nor the act of 1866 should be construed to entitle more than one company to the grant of land, and that following such provision which was in the act of 1869 there was this proviso: "And provided further, That the lands granted by the act aforesaid [act of 1866] shall be sold to actual settlers only, in quantities not greater than one quarter section to one purchaser, and for a price not exceeding two dollars and fifty cents per acre."

That the act of May 4, 1870, also contained the provision (§ 4) that the lands granted thereby, excepting only such as were necessary for depots and other needful uses in operating the road, should "be sold by the company only to actual settlers, in quantities not exceeding one hundred and sixty acres or a quarter section to any one settler, and at prices not exceeding two dollars and fifty cents per acre."

The bill also detailed the organization of companies and the steps taken by them to avail themselves of the grants and accomplish the purpose for which they were made; the steps and proceedings in the construction of the roads contemplated; the issue of patents for the lands granted; the amount of land sold and unsold, and wherein

and by what acts there had been breaches of the provisions of the acts above set forth, which were alleged to have been conditions subsequent, and that by such breaches the grants had become forfeited. The bill likewise detailed the various steps and the proceedings whereby the Oregon & California Railroad Company became the owner of the grants, the connection of the defendants, Southern Pacific Company, Gage and the Union Trust Company therewith, and the rights they asserted therein.

It was alleged that each of the other defendants (other than the railroad company, the Southern Pacific Company, Gage and the Union Trust Company) asserted an interest in the lands, created, as they alleged, by actual settlement in good faith upon certain of the unsold lands, not exceeding one quarter section, with intention of making a permanent home thereof, and had applied to the railroad company to purchase the same; that the said defendants had instituted suits against the railroad company, Gage and the Union Trust Company to compel a sale and conveyance of the lands to them; that unless enjoined they would prosecute their suits to final judgments, and that they were hence made parties to this suit in order that they might be so enjoined, and, if the court so order, be permitted to set forth their respective claims for adjudication.

The bill prayed a forfeiture of the unsold lands and that the title of the Government thereto be quieted, or, if such relief be denied, that the lands be adjudged subject to purchase by actual settlers in quantities not exceeding 160 acres to any one purchaser and at a price not exceeding $2.50 per acre; that a receiver be appointed to sell the lands and account for the proceeds "as the court shall direct."

If such relief be denied, that a mandatory injunction issue requiring the railroad company to offer for sale and to sell the lands as required by the grants. And the

bill also prayed that all of the defendants be enjoined
from asserting any right, title or interest in and to the
lands or committing waste thereon and for an accounting
of all moneys received from the sale of lands or timber.

The persons who asserted interests acquired by actual
settlement were made parties to this suit and the causes
consolidated, and Snyder and others filed cross complaints
herein setting up their alleged rights. And there were
about 6,000 other persons who by the court were per-
mitted as interveners to present their claims for considera-
tion and adjudication. They are represented in the record
by the petition and papers of B. W. Nunnally and
others.

The cross complainants alleged that they were actual
settlers upon the lands granted by the act of May 4, 1870,
long prior to the institution of any suit or the assertion
of any claim of forfeiture by the Government; and the
petitions in intervention averred that the petitioners
were applicants to purchase lands granted by that act
or the act of July 25, 1866; and both cross complaints
and petitions respectively alleged in substance that the
lands were granted in trust to the respective grantee
companies for actual settlers or those who should become
such, and alleged respectively tender of the purchase
price, demand for conveyances and the refusal of the
railroad company to accept the tender or make the con-
veyances. And both cross complainants and interveners
asserted a prior right to the extent of the land demanded
by them, respectively; denied that the grants had be-
come forfeited, and resisted the relief prayed by the
Government. They adopted in all other particulars the
allegations of the bill and relied upon them as the basis
of their respective claims; prayed that the railroad com-
pany be decreed to hold in trust the legal title to the land
respectively claimed by them, that their several rights
be established and enforced, and that the railroad com-

pany be directed to convey to each of them the tract of land applied for by each, and. for general relief.

Demurrers were sustained to the cross complaints and to the petitions in intervention. Demurrers to the bill were overruled. 186 Fed. Rep. 861. Joint and several answers were then filed by the railroad company, the Southern Pacific Company and Gage. The Union Trust Company answered separately. These companies when referred to collectively will be called defendants.

The answers admitted most of the allegations of the bill and denied others; alleged facts in- resistance to the construction of the Government of the acts of Congress and to the relief prayed, justified the alleged breaches of the conditions or covenants of the grants, and set up laches, waiver of the breaches, and statutes of limitation.

A great deal of testimony was taken, but the case was practically submitted and a decree entered upon a stipulation of facts made by the Government and defendants. It of itself is quite voluminous, but we deem only certain of its facts material.

By the act of July 25, 1866, *supra* (c. 242, 14 Stat. 239), Congress authorized and empowered the California & Oregon Railroad Company, which had been organized under a statute of the State of California, and such company, organized under the laws of Oregon, as the legislature of that State should designate, to construct and maintain a railroad and telegraph line between the city of Portland, in Oregon, and the Central Pacific Railroad in California, as follows: The California & Oregon Company to construct that part of the railroad and telegraph line within the State of California, beginning at a point to be selected by the company on the Central Pacific Railroad in Sacramento Valley, and running thence northerly through the Sacramento and Shasta valleys to the northern boundary of the State. The Oregon company to construct the part in Oregon from Portland south

through certain designated valleys to the southern boundary of Oregon to connect with the part constructed by the first-named company. Whichever company first completed its respective part of the road from the designated terminus to the boundary line between the States was authorized to continue construction until the parts should meet and connect, and the whole line of railroad and telegraph should be completed.

Section 2 of the act granted to the companies, their successors and assigns, "for the purpose of aiding in the construction of said railroad and telegraph line, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores over the line of said railroad, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile (ten on each side) of said railroad line."

In case of deficiency in the original sections granted other lands might be selected in lieu thereof. Upon the filing of the survey of the railroad the lands granted were to be withdrawn from public sale so far as located within the limits designated. And it was provided that the lands granted should be applied to the building of the said road within the States, respectively, wherein they were situated; and that the lands reserved by the Government should not be sold except at double the minimum price of public lands, with provisions for sale to actual settlers under the preëmption and the homestead laws.

Section 3 granted to the companies the right of way through the public lands "for the construction of said railroad and telegraph line" 100 feet in width on each side of the road, including grounds for stations, etc., and the right to take from the public lands materials for the construction of the road.

Section 4 provided that when 20 or more consecutive

miles of any portion of the railroad and telegraph line should be ready for the service contemplated, commissioners should be appointed by the President to examine the same, and if it should appear that 20 miles had been completed and equipped in all respects as required by the act, and the commissioners should so report under oath to the President of the United States, patents should issue to the companies or either of them, as the case might be, to the extent of the completed section, and successively as 20 or more miles should be constructed, until the entire railroad and telegraph line authorized by the act should be constructed, and patents to the lands granted should be issued.

Section 5 expressed that the grants were made upon the condition that the companies should keep the railroad and telegraph in repair and use and transport the mails and dispatches for the Government when required to do so by any Department thereof; that the Government should have the preference in the use of the railroad and telegraph at reasonable rates not exceeding those paid by private parties, and that the road should remain a public highway for the use of the Government, free of toll or other charges upon the transportation of the property or troops of the United States, and at the cost and charge of the corporation or companies.

Section 6 required assent to the act to be filed in the Department of the Interior within one year after the passage of the act, and that the first section of 20 miles should be completed within two years and 20 miles in each year thereafter, and the whole on or before July 1, 1875; and the road to be of the same gauge as the Central Pacific Railroad of California and be connected therewith.

Section 7 required the roads to be operated and used as one connected and continuous line and afford to the Government and the public equal advantages and facilities as to rates, time and transportation.

Section 8 provided that for failure to file assent to the act or to complete the road as required the act should be null and void, "and all the lands not conveyed by patent to said company or companies, as the case may be, at the date of such failure, shall revert to the United States." And it was provided if the road and telegraph should not be kept in repair and fit for use the United States might put the same in repair and use and might devote the income of the road and telegraph line to repay all expenditure caused by the default of the companies or either of them, or might fix pecuniary responsibility not exceeding the value of the lands granted.

Section 9 provided that wherever the word "company" or "companies" was used in the act it should be construed to embrace the words "their associates, successors and assigns" the same as if the words had been inserted or thereto annexed.

Sections 10 and 11 are not material to be quoted. And § 12 provided that Congress might, at any time, having due regard for the right of the companies, "add to, alter, amend or repeal" the act.

To avail of the grant, the Oregon Central Railroad Company was incorporated October 6, 1866. It projected its road from Portland to Forest Grove, thence southerly on the westerly side of the Willamette River and became known as the "West Side Company" and its railroad line as the "West Side Line."

The legislature of Oregon, by joint resolution adopted October 10, 1866, designated the Oregon Central as the road to receive the land grant. (There were certain steps in the organization of the Company not important.)

The assent of the company to the act of 1866 was filed in the office of the Secretary of the Interior and subsequently (August 20, 1868) a map of survey of its projected line.

April 22, 1867, certain persons, contending that the

West Side Company had not been lawfully incorporated or organized, and designing to secure the grants and other benefits under the act of 1866, caused proceedings to be taken, intending to organize under the general laws of Oregon the Oregon Central Railroad Company of Salem, and so named in its articles of incorporation. It projected its line of railroad on the easterly side of the Willamette River and became known as the "East Side Company" and its railroad line as the "East Side Line."

In furtherance of its design it procured from the legislature of Oregon on October 20, 1868, the adoption of a joint resolution which declared that the West Side Company was not properly incorporated and was incapable of receiving the grant, and designated the Oregon Central Railroad Company organized at Salem on April 22, 1867, "as the company entitled to receive the lands in Oregon, and the benefits and privileges conferred by the said act of Congress." Oregon Session Laws, 1868.

Controversy arose between the companies as to which was entitled to the benefits of the act of 1866, which controversy continued until about January, 1870.

The controversy was carried to Congress and on April 10, 1869, Congress passed an act which amended § 6 of the act of 1866 so as to allow any railroad company theretofore designated by the legislature of Oregon to file its assent to the act of 1866 within one year from the date of the amending act and providing that nothing therein contained should impair any rights theretofore acquired by any railroad company; but declaring that neither the act of 1866 nor the amending act should be construed to entitle more than one company to a grant of land. "And provided further, That the lands granted by the act aforesaid [act of 1866] shall be sold to actual settlers only, in quantities not greater than one quarter section to one purchaser, and for a price not exceeding two dollars and fifty cents per acre."

On June 8, 1869, the East Side Company adopted a resolution which recited the act of July, 1866, its designation by the legislature of Oregon as the company to receive the grant, the passage of the act of April 10, 1869, and concluded as follows: "This company, the Oregon Central Railroad of Salem, Oregon, . . . do hereby accept all the provisions, rights, privileges, and franchises of said act of July 25, 1866, . . . and of all acts amendatory thereof, and upon the conditions therein specified, and do hereby give our assent and the assent of such company thereto."

A certified copy of the resolution was filed in the office of the Secretary of the Interior June 30, 1869, and in the following October a map of survey of location of the first 60 miles of the projected line. On December 24, following, the company completed the first 20 miles within the prescribed time, and the same was examined and approved by commissioners appointed therefor pursuant to the provisions of § 4 of the act of 1866.

March 16, 1870, the Oregon & California Railroad Company was incorporated, and, on March 29, 1870, the East Side Company assigned to it all of its property, including the land grant, with present and future rights under the act of July, 1866, and acts amendatory thereof and supplemental thereto, and by virtue of any act or resolution of the legislature of Oregon, and by the action of its stockholders the East Side Company was dissolved and its stock canceled.

Resolutions were adopted by the Oregon & California Railroad Company accepting the transfer and also a resolution accepting the act of 1866 and amendments thereto, and "all the benefits and emoluments therein or thereof granted, and upon the terms and conditions therein specified," and authorizing its assent to be filed with the Secretary of the Interior and a copy of the deed of assignment from the Oregon Central Railroad Company. This

was done, and since the date of the transfer (March 29, 1870) the Oregon & California Railroad Company has assumed and still assumes itself to be the successor of the East Side Company and of all its rights under the acts of Congress.

The West Side Company abandoned all claims under the act of 1866 and solicited and obtained from Congress, by the act of May 4, 1870, a grant of other lands. The act recited (§ 1) that for the purpose of aiding in the construction of a railroad and telegraph line from Portland to Astoria, and from a suitable point of junction near Forest Grove to the Yamkill River, near McMinnville, in the State of Oregon, there is granted to the Oregon Central Railroad Company, now engaged in constructing the said road, and to their successors and assigns, the right of way through the public lands, and the right to take materials from the public lands and necessary lands for depots, etc., not exceeding 40 acres at any one place; and also 20 alternate sections per mile of the public lands, not mineral, excepting coal or iron lands, designated by odd numbers, not disposed of or reserved or held by valid preëmption or homestead rights at the time of the passage of the act.

There was the usual provision for selecting other lands in case of deficiency; the survey of the lands along the line of the railroad; the segregation of lands upon the survey and location of 20 or more miles of road; and for the disposition of the lands reserved by the Government within the limits of the grant only to actual settlers at double the minimum price for such lands.

The issuance of patents was provided (§ 3) upon the completion and equipment of 20 mile sections of the railroad.

By § 4 it was enacted "That the said alternate sections of land granted by this act, excepting only such as are necessary for the company to reserve for depots, stations,

side tracks, wood yards, standing ground, and other needful uses in operating the road, shall be sold by the company only to actual settlers, in quantities not exceeding one hundred and sixty acres or a quarter section to any one settler, and at prices not exceeding two dollars and fifty cents per acre."

It was provided (§ 5) that the Company should, by mortgage or deed of trust to two or more trustees, appropriate and set apart the net proceeds of the lands as a sinking fund, to be kept invested in United States bonds or other safe securities for the purchase from time to time of the first mortgage construction bonds on the road, depots, etc., and that no part of the funds should be applied to any other purpose until all of the bonds should have been purchased or redeemed or canceled.

An assent to the act was required to be filed with the Secretary of the Interior (§ 6) and it was expressed that the grant was upon the condition that 20 miles or more of the road should be completed within two years and the entire road and telegraph line within six years from the date of the act.

In this act Congress, by the words "Oregon Central Railroad Company," referred to the West Side Company.

On July 20, 1870, the West Side Company filed its assent to the act in the office of the Secretary of the Interior.

During the year 1870 the Oregon & California Railroad Company procured, by mortgage bonds, approximately $8,000,000, and during the year 1871 the West Side Company in the same way procured about $1,000,000. With the funds thus procured the lines of railroad contemplated by the act of 1866 and the act of May 4, 1870, respectively, were prosecuted continuously until about January, 1873.

As stated, the East Side Company completed the construction of the first 20 miles of its railroad, and the Oregon & California Railroad Company, after the assignment and transfer to it, as stated, continued construction

in 1870, 1871 and 1872 for a distance of approximately 197 miles; and the West Side Company, with the funds procured by it in 1871, constructed its line under the act of 1870 from Portland to McMinnville, a distance of approximately 47 miles. There was no other construction by the West Side Company, and the lands contiguous to the line of road from Forest Grove to Astoria was forfeited by act of Congress of January 31, 1885.

Financial vicissitudes came to both companies and construction was suspended. It was never resumed by the West Side Company, and the East Side Company, under its new name of Oregon & California Railroad Company, finally became, by the assignment of the West Side Company, the owner of the grants under both acts.

The consideration of the conveyance was the payment of the debts of the West Side Company. Since the date of the conveyance the Oregon & California Railroad Company has assumed and still assumes itself to be the successor of the West Side Company in and to all of the rights, franchises and property granted or intended to be granted by the act of May 4, 1870.

Further financial difficulties impeded the construction of the road and these were met by the various processes detailed in the stipulation of facts, and which we omit except as referred to in the opinion. Among these were a cancellation of the stock of the company and a reissue secured by a trust deed, of which Stephen T. Gage became the only surviving trustee, an issue of bonds, the trust deed to the Union Trust Company, leases to the Southern Pacific Company and the final control by that company through stock ownership of all of the properties and land grants. That company thereafter administered the land grants. These transactions were alleged as breaches of the conditions which, it is contended, were constituted by the provisos in the respective acts given above, providing for the sale of the granted lands to actual settlers.

163,430.28 acres of the granted lands were sold by the Oregon & California Railroad Company prior to May 12, 1887, nearly all of which were sold to actual settlers, in small quantities, although in a few instances the quantities exceeded 160 acres to one purchaser and the prices were slightly in excess of $2.50 an acre. A rapidly increasing demand for the lands in large quantities and at increased prices commenced about 1889 or 1890 and has continued ever since. From 1894 to 1903 some of the granted lands were sold to persons not actual settlers in quantities and at prices exceeding the maximum designated in the provisos, and in several instances in quantities of from 1,000 to 20,000 acres to one purchaser at prices ranging from $5 to $40 an acre—and in one instance a sale of 45,000 acres at $7 an acre to a single purchaser. About 5,306 sales were made, aggregating 820,000 acres, of which sales about 4,930 were for quantities not exceeding 160 acres and 376 sales in quantities exceeding 160 acres to one purchaser, aggregating 524,000 acres. The latter sales were to persons other than actual settlers and for other purposes than settlement and at prices in excess of $2.50 an acre; and approximately 478,000 acres were sold since 1897 and approximately 370,000 of the 524,000 were sold to 38 purchasers in quantities exceeding 2,000 acres to each purchaser. Approximately three-fourths of all sales made since 1897 were made by contracts providing for the payment of the purchase price in from five to ten annual payments and execution of conveyance upon final payment, a considerable number of which contracts were pending when this suit was brought.

On January 1, 1903, the company withdrew from sale all of its lands and refused to accept offers for any of them, asserting that they were timber lands and unsuitable for settlement. At the time the answer was filed there remained unsold 2,360,492.81 acres, of which 2,075,616.45 acres were theretofore patented under the land grant

acts, and 284,876.36 at that time remained. unpatented, all of which are claimed by the company under the land grants.

Since January, 1903, over 4,000 persons have applied to purchase certain of the unsold lands, claiming that they desired to do so for the purpose of settling and establish- ing homes thereon, and each applicant stated that he was willing and able to tender at the rate of $2.50 per acre therefor.   Until about the year 1890 or 1891 there was substantially no demand for the granted lands except for the purpose of settlement, and nearly all of the sales prior to the year 1894 were made for settlement and to settlers.

. Prior to 1894 the company maintained an immigration bureau to induce settlement upon the lands, and · the greater part of the sales made after that year were to persons not settlers and for prices exceeding $2.50 per acre.

It was testified that the gross amount of lands that inured to the Oregon & California Railroad Company under both the East Side and the West Side grants was 3,182,169.57 acres, and it was stipulated that between the years 1871 and 1906 there were patented under the East Side grant 2,745,786.68 acres and between the years 1895 and 1903 there were patented under the West Side grant 128,618.13 acres, leaving unpatented 307,764.76 acres.

At the time the answer was filed there remained un- sold of the granted lands 2,360,492.81 acres, of which 2,075,616.45 acres were theretofore patented to the Oregon & California Railroad Company under the land grants and 284,876.36 thereof at that time remained unpatented, all of which unsold lands are claimed by the railroad com- pany under and by virtue of the grants.   The reasonable value of said unsold lands exceed the sum of $30,000,000. There is a table attached to the answer showing the net amount received by the railroad company to be, after,

all disbursements, $2,495,094.03. (The bill, as we have seen and shall presently more at length refer to, prays a forfeiture of the unsold lands only.)

Pursuant to the rules and regulations of the Interior Department, all of the patents were issued to and based upon applications in writing therefor from time to time filed in the appropriate land office of the United States by the Oregon & California Railroad Company as the "successor and assign" of the East Side Company and the West Side Company, respectively. Each application was accompanied by an affidavit which alleged, among other things, the following: "The said lands are vacant, unappropriated, are not interdicted mineral, nor reserved lands, and are of the character contemplated by the granting act" under which the patents were applied for.

The stipulation sets out the creation of an Auditor of Railroad Accounts, and subsequently the creation of a Commissioner of Railroads and his duties by various acts of Congress until 1904, when the bureau was terminated and the duties, files and records thereof were transferred to the Secretary of the Interior, and that from 1879 to and including 1903 reports were made of the transactions of the Land Department of the Oregon & California Railroad Company upon blanks furnished by such bureau. The details of the reports are given, which show many sales of the lands in excess of $2.50 per acre.

The bureau, it is stipulated, made annual reports to the Secretary of the Interior which were embodied in his annual reports to the President and by the President forwarded to Congress, where they were referred to appropriate committees and printed as executive documents.

These reports show the administration of the grants by the company, the number of acres received under the grants, the number sold and at what prices, some of which exceeded $2.50 per acre, and that the price asked for lands not sold was in excess of that sum per acre.

*Mr. P. F. Dunne,* with whom *Mr. Wm. F. Herrin, Mr. Wm. D. Fenton, Mr. Frank C. Cleary* and *Mr. Joseph H. Call* were on the brief, for appellant railroads.

*Mr. John C. Spooner,* with whom *Mr. John M. Gearin* was on the brief, for appellant, Union Trust Company.

*Mr. John Mills Day,* with whom *Mr. M. E. Brewer, Mr. Charles E. Shepard* and *Mr. Lewis C. Garrigus* were on the brief, for interveners.

*Mr. A. W. Lafferty* for cross complainant.

*Mr. Constantine J. Smyth,* Special Assistant to the Attorney General, with whom *Mr. Solicitor General Davis* and *Mr. Assistant Attorney General Knaebel* were on the brief, for the United States.

*Mr. George M. Brown,* Attorney General of the State of Oregon, filed a brief as *amicus curiæ.*[1]

After stating the case as above, MR. JUSTICE McKENNA delivered the opinion of the court.

A direct and simple description of the case would seem to be that it presents for judgment a few provisions in two acts of Congress which neither of themselves nor from the context demand much effort of interpretation or construction. But the case has never been considered as having that simple directness. A bill which occupies 78 pages of the record (exclusive of exhibits), the allegations of which were iterated and reiterated by cross complainants and interveners and added to, and an answer that admitted or

---

[1] It is not possible to make abstracts of the briefs, as there are more than ten of them containing over 2500 pages. Several hundred authorities are cited.

traversed their averments with equal volume and circumstance, constituted the case for trial. Seventeen volumes of testimony, each of many pages, were deemed necessary to sustain the case as made. It is certain, therefore, that no averment has been omitted from the pleadings; no fact from the testimony that has any bearing on the case; the industry of counsel has neglected no statute or citation, and their ability no comment or reason that can elucidate or persuade. As we proceed it will be seen that we have rejected some contentions. It is not the fault of counsel if we have misunderstood them.

Yet with all the research, it may be on account of it, the contestants have not preserved an exact alignment and have shown no preference as to the company in which contentions are made or opposed.

The Government contends that the provisos, we so designate them and shall so refer to them, though they differ in technical language, constitute conditions subsequent and that by the alleged breaches indicated the lands became forfeited to the United States. The railroad company and other defendants contend that the provisos constitute restrictive and unenforceable covenants. The cross complainants insist that a trust was created for actual settlers and the interveners urge that the trust has the broader scope of including all persons who desire to make actual settlement upon the lands.

This curious situation is presented: The Government joins with the railroad in opposing the contentions of the cross complainants and interveners. Both of the latter unite with the Government in contesting the position of the railroad but join with the railroad against the Government's assertion of forfeiture. The cross complainants attack the claim of the interveners, and the State of Oregon, through its Attorney General, without definitely taking sides in the controversies, declares it to be to the interest of the State and expresses the hope that the lands

now withdrawn by the railroad shall be "subject to settlement and improvement, as contemplated by the provisions of the grant, in order that these vast areas of the State may be improved, but also that the lands may not be withdrawn from taxation, thus depriving the State, and especially the eighteen counties in which they are situated, of a large proportion of their resources from direct taxation." The interest and hope expressed seem like a prayer against the Government's contentions.

There is something more in these opposing contentions than a wrangle or medley of interests, and we are admonished that the words of the provisos, simple and direct as they are of themselves, take on, when they come to be applied, ambiguous and disputable meaning. It may be said at the outset that if ambiguity exists there may be argument in it against some of the contentions.

However, without anticipating, let us consider the provisos, and we repeat them to have them immediately under our eyes. The first is contained in the act of April 10, 1869. That act was expressed to be an amendment of the act of 1866 and to relieve from the effect of the expiration of the time for filing assent to the act of 1866 and to give "such filing of assent, if done within one year from the passage of the" amending act, the same force and effect to all intents and purposes as if it had been filed within one year after the passage of the act of 1866. Then came this proviso, which was preceded by another not necessary to quote: "*And provided further,* That the lands granted by the act aforesaid shall be sold to actual settlers only, in quantities not greater than one quarter section to one purchaser, and for a price not exceeding two dollars and fifty cents per acre."

The act of May 4, 1870, making the grant to the West Side Company, provides in § 4 that the lands granted, excepting only such as are necessary for depots and other needful uses in operating the road, "shall be sold by the

company to actual settlers," the quantities and the price being designated as in the act of 1869.

These, then, are the provisos which are submitted for construction. The contention of the Government is as we have seen, and it lies at the foundation of its assertion of forfeiture of the grant, that they constitute conditions subsequent.

The argument to support the contention is based first on the general considerations that experience had demonstrated to the country the evils of unrestricted grants, and that the bounty of Congress had been perverted into a means of enriching "a few financial adventurers," and that lands granted for national purposes "were disposed of in large blocks to speculators as well as to development companies organized by officers of the railroad companies." Informed by such experience, in substance is the contention, and solicited by petition and moved by the reasoning of some of its members, Congress changed its policy of unqualified bounty, and, while not refusing to contribute to the aid of great enterprises, sought to prevent the perversion of such aid to selfish and personal ends, and to promote the development of the country by the disposition to actual settlers of the lands granted. And, it is insisted, efficient means were adopted to secure the purpose by making the provisos conditions subsequent, with the sanction of forfeiture for violation.

These general considerations are supplemented by a special and technical argument. The provisos and their context, it is said, show the general characteristics of conditions, that is, they make the estate granted and its continuance to depend upon the doing of something by the grantee, and that the proviso in the act of 1869 is expressed in apt and technical words, by the use of which, it is further contended, it is established by authority that an estate upon condition is necessarily created. Cases are cited, and the following is quoted from page 121 of Shep·

pard's Touchstone: "That for the most part conditions have conditional words in their frontispiece, and do begin therewith; and that amongst these words there are three words that are most proper, which in and of their own nature and efficacy, without any addition of other words of reëntry in the conclusion of the condition, do make the estate conditional, as *proviso, ita quod,* and *sub conditione.* . . . But there are other words, as *si, si contingat,* and the like, that will make an estate conditional also, but then they must have other words joined with them and added to them in the close of the condition, as that then the grantor shall reënter, or that then the estate shall be void, or the like." And words of such determining effect, it is urged, introduce and give meaning to the proviso in the amendatory act of 1869.

But it will be observed there are no such controlling words in the provision for the sale to actual settlers in the act of May 4, 1870, that is, in the grant to the West Side Company; and the Government is confronted by the rule which it quotes, that in such cases there must be "words of reëntry" or a declaration "that then the estate shall be void, or the like." The Government, therefore, varies and relaxes the rule it invokes and admits that the sense of a law or terms of an instrument may be found in other words than the quoted technical ones if the intention is made clear.

It is not necessary to review the cases cited respectively to sustain and oppose the contending arguments. The principles announced in the cases are rudimentary and may be assumed to be known and the final test of their application to be the intention of the grantor.

These principles will be kept in mind in our consideration of the acts of Congress involved, and, besides, that there may be a difference in rigor between public and private grants and that this court has especially said that railroad land grants have the command and necessarily, therefore, the effect of law.

The Government reinforces its contention, as we have seen, with what it considers a change of policy in legislation and in effect insists that restrictions upon the disposition of the lands granted became more dominant in purpose than the building of the roads, to aid which it was admitted the lands were necessary. The argument is hard to handle, as indeed are all arguments which attempt to assign the exact or relative inducements to conjoint purposes. In the first grants to railroads there were no restrictions upon the disposition of the lands. They were given as aids to enterprises of great magnitude and uncertain success and which might not have succeeded under a restrictive or qualified aid. However, a change of times and conditions brought a change in policy, and while there was a definite and distinct purpose to aid the building of other railroads, there was also the purpose to restrict the sale of the granted lands to actual settlers. These purposes should be kept in mind and in their proper relation and subordination.

We shall be led into error if we conclude that because the railroad is attained it was from the beginning an assured success, and that it was a secondary and not a primary purpose of the acts of Congress. There is much in the argument of the defendants that the aid to the company was part of the national purpose, which this court has said induced the grants to the transcontinental railroads (91 U. S. 79; 99 U. S. 48; *United States* v. *Sanford*, 161 U. S. 412). And we may say that the policy was justified by success. Empire was given a path westward and prosperous commonwealths took the place of a wilderness.

But such success had not been achieved when the grant of 1866 was made nor in full measure when the acts of 1869 and 1870 were passed, and it may be conceded that they were intended to continue and complete such national purpose, and that it was of the first consideration, but the

secondary purpose was regarded and provided for in the provisos under review.  Both purposes must be considered. It may be that it was not expected that actual settlers would crowd into "the vast unpeopled territory," but the existence of such settlers at some time must have been contemplated.  Both purposes, we repeat, were to be subserved, and how to be subserved is the problem of the case.

There is certainly a first impression against a forfeiture being the solution of the problem or that there was necessity for it.  A forfeiture of the grant might have been the destruction of the enterprise, and settlement postponed or made impossible to any useful extent by the inaccessibility of the lands.  And forfeiture was besides beset with many practical difficulties as a remedy.  When, indeed, would it be incurred?  The obligation of the provisos and the remedy for their breach were coincident.  The refusal of the demand of the first actual settler (if there could be such without the consent of the railroad) or of the first applicant for settlement would subvert the scheme of the acts of Congress.  It cannot be that the grants were intended to be so dependent and precarious and the enterprises so menaced with peril and, it might be, brought to disaster.

Are the contingencies fanciful?  Such character may be asserted of any conjecture of what might have occurred but which did not, and yet to construe a statute we must realize its inducements and aims, solving disputes about them by a consideration of what might accomplish or defeat such aims.  The acts under review conferred rights as well as imposed obligations, and it could not have been intended that the latter should be so enforced as to defeat the former.  We have given an instance of how this might be done by regarding the provisos as conditions subsequent.  Another instance may be given.  In its argument at bar the Government insisted that it was the duty of

the railroad company to have provided the machinery for settlement and, by optional sales, guarded by probational occupation of the lands, to demonstrate not only initial but the continued good faith of settlers, and that the omission to do so was of itself a breach of the provisos and incurred a forfeiture of the grants. But when did such obligation attach? Before or after the construction of the road—construction in sections or completely? The contention encounters the Government's admission that there was no obligation imposed upon the railroad to sell. And we have the curious situation (which is made something of by cross complainants and interveners in opposition to the Government's contention) of the right of settlers to buy but no obligation on the railroad to sell, and yet a duty of providing for sales under an extreme and drastic penalty. We may repeat the question, Might not such consequences have ended the enterprise, making it and its great purpose subordinate to local settlement? Indeed, might not both have been defeated by the inversion of their purposes.

The omission to institute a plan of settlement and sale is not alleged in the bill as a breach of the provisos. The first breach alleged is the trust deed to Stephen T. Gage, and the next the trust deed to the Union Trust Company. But these deeds manifestly were but forms of security, even if they went too far and were not binding to the extent of their excess. The Government admits that the grants were intended to be used as a basis of credit; and we have argument again against a forfeiture by the dilemma to which the railroad might be brought in its attempt to comply with all the provisions of the act as well as with the provisos. If it failed to complete the road within the time required the granting act was to become "null and void," (upon which we shall presently comment). If it made efforts to complete the road by using the grants as a means of credit it might forfeit them.

But there is a better argument than what may be deduced from the solution of perplexing difficulties or the conjecture of possible contingencies. It will be observed that there was an explicit provision in the act of 1866 that upon the failure of the companies to file assent to the act and to complete the road as and within the time required, the act should "be null and void" and the lands not patented at the time of such failure should "revert to the United States." And it was provided that if the road should not be "kept in repair and fit for use," Congress by legislation might put the same in that condition and repay its expenditures from the road's income or fix pecuniary responsibility upon the company not exceeding the value of the lands granted.

Congress, therefore, had under consideration remedies for violations of the provisions of the act and adjusted them according to what it considered the exigency. As a penalty for not completing the road as prescribed Congress declared only for a reversion of the lands *not then patented;* for not maintaining it in repair and use Congress reserved the right temporarily to sequester the road; and yet for a violation of the provision for sale to settlers it is urged that Congress condemned to forfeiture not only the lands then *unpatented but those patented.* Mark the difference. Was noncompletion of the road of less consequence than settlement along its line?—not necessarily complete settlement but any settlement—the refusal, it might be, of the acceptance of a single offer of settlement or even, as it is contended, of making provision for settlement, being of greater consequence and denounced by more severe penalty than the declared conditions, that is, assent to the act, completion of the road, and its maintenance. This is difficult, if not impossible to believe.

It appears, therefore, that the acts of Congress have no such certainty as to establish forfeiture of the grants as their sanction, nor necessity for it to secure the accom-

plishment of their purposes,—either of the construction of the road or sale to actual settlers—and we think the principle must govern that conditions subsequent are not favored but are always strictly construed, and where there are doubts whether a clause be a covenant or condition the courts will incline against the latter construction; indeed, always construe clauses in deeds as covenants rather than as conditions, if it is possible to do so. 2 Washburn on Real Property, 4. And this because "they are clauses of contingency on the happening of which the estates granted may be defeated." And it is a general principle that a court of equity is reluctant to (some authorities say never will) lend its aid to enforce a forfeiture.

By this conclusion do we leave the provisos meaningless and the Government without remedy for their violation? There is no argument in a negative answer. From the defects of a provision we can deduce nothing nor on account of them substitute one of greater efficacy.

But must the answer be in the negative, and by rejecting the contention of the Government are we compelled to accept that of the railroad company?—or we may say those of the railroad company, for the contentions are many, some of which preclude the application of the provisos, some of which assert their invalidity and others limit their application.

If not first in order, at least in more immediate connection with the contention of the Government is the contention that the provisos are not conditions subsequent but simple covenants, and, it is said, restrictive and negative only, and therefore not enforceable. In support of the contention all of the uncertainties or asserted uncertainties of the provisos are marshaled and amplified. We can only enumerate them. There is uncertainty, it is asserted, in the legal measure of duty, therefore of its performance—for whom to be performed and when; nor is the time or condition of settlement prescribed, whether

by the standard of the homestead or preëmption laws;
nor by what test or by what tribunal contests between
applicants to purchase are to be determined; no compul-
sion of sale at any time, to any person, in any quantity;
no mutuality in the covenant; no assurance that settlers
will apply, and no obligation assumed by them. And the
conclusion is deduced that the actual settlers clauses,
viewed even as covenants, were either impossible of per-
formance or repugnant to the grants, and, therefore, void.

The arraignment seems very formidable, but is it not
entirely artificial? It is stipulated that prior to 1887 more
than 163,000 acres of the granted lands were sold, nearly
all of which were sold to actual settlers, in small quantities.
If the sale of 163,000 acres of land encountered no ob-
stacle in the enumerated uncertainties we cannot be im-
pressed with their power to obstruct the sale of the bal-
ance of the lands. The demonstration of the example
would seem to need no addition. But passing the example,
as it may be contended to have some explanation in the
character of the lands so disposed of, the deduction from
the asserted uncertainties is met and overcome by the
provisos and their explicit direction. They are, it is true,
cast in language of limitation and prohibition; the sales
are to be made only to certain persons and not exceeding
a specified maximum in quantities and prices. If the
language may be said not to impose "an affirmative obli-
gation to people the country" it certainly imposes an
obligation not to violate the limitations and prohibitions
when sales were made, and it is the concession of one of
the briefs that the obligation is enforceable, and that,
even regarding the covenant as restrictive, the "juris-
diction of a court of equity, upon a breach or threatened
breach of the covenant, to enforce performance by en-
joining a violation of the covenant cannot be doubted."
Apposite cases are cited to sustain the admission, and in
answer to the contention of the Government that it could

recover no damages for the breach and hence had no enforceable remedy but forfeiture, it is said: "But the jurisdiction of a court of equity in such cases does not depend upon the showing of damage. Indeed, the very fact that injury is of public character and such that no damage could be calculated, is an added reason for the intervention of equity." And cases are adduced. We concur in the reasoning and give it greater breadth in the case at bar than counsel do. They would confine it, or seem to do so, to the compulsion of sales of land susceptible of actual settlement, and assert that the evidence established that not all of the lands, nor indeed the greater part of them, have such susceptibility. But neither the provisos nor the other parts of the granting acts make a distinction between the lands, and we are unable to do so. The language of the grants and of the limitations upon them is general. We cannot attach exceptions to it. The evil of an attempt is manifest. The grants must be taken as they were given. Assent to them was required and made, and we cannot import a different measure of the requirement and the assent than the language of the act expresses. It is to be remembered the acts are laws as well as grants and must be given the exactness of laws.

If the provisos were ignorantly adopted as they are asserted to have been; if the actual conditions were unknown, as is asserted; if but little of the land was arable, most of it covered with timber and valuable only for timber and not fit for the acquisition of homes; if a great deal of it was nothing but a wilderness of mountain and rock and forest; if its character was given evidence by the application of the Timber & Stone Act to the reserved lands; if settlers neither crowded before nor crowded after the railroad, nor could do so; if the grants were not as valuable for sale or credit as they were supposed to have been and difficulties beset both uses, the remedy was obvious.

Granting the obstacles and infirmities, they were but promptings and reasons for an appeal to Congress to relax the law; they were neither cause nor justification for violating it. Besides, we may say that there is controversy about all of the asserted facts and conclusions.

Our conclusions, then, on the contentions of the Government and the railroad company are that the provisos are not conditions subsequent; that they are covenants, and enforceable; and we pass to the other contentions of the company.

It is contended (1) that Congress was without lawful authority on April 10, 1869, to annex a new condition, by amendment or otherwise, to the grant made by the act of 1866 as amended by the act of June 25, 1868 (the latter extended the time to complete the first and subsequent sections of the road and the completion of the whole road). We do not think it is necessary to follow the involutions of the argument by which the contention is attempted to be supported. It is asserted that the California & Oregon Railroad Company filed its assent within one year and completed the first section of twenty miles within two years after the passage of the act of July 25, 1866, and that the Oregon Central Railroad Company (East Side Company) was not in default on April 10, 1869. The assertions come very late. Had they been made at that early time, questions would have been presented whose solution we need not conjecture. The West Side Company preceded the East Side Company and on October 10, 1866, received the designation from the Oregon legislature as the road entitled to receive the grant of 1866. The East Side Company started its existence on April 22, 1867, and in 1868 attacked the legality of the incorporation of the other company and procured the revocation of the designation of that company and the designation of itself by the legislature. The controversy for precedence and rights continued. It was carried to Congress, and the

act of April 10, 1869, was passed. Subsequently came compromises and the act of May 4, 1870. By the latter act and in acceptance of its grant and provisions, the West Side Company took the west side of the Willamette River. The East Side Company took the east side of the river and on June 8, 1869, by resolution, accepted the provisions of the act of 1866 "and of all acts amendatory thereof, and upon conditions therein specified, and do hereby give our assent and the assent of such company thereto." It was not then thought, as it is now asserted, that the act of 1869 annexed new and invalid conditions, nor was there such assertion afterwards. The East Side Company, on March 29, 1870, assigned its rights under the act of 1866 *and the acts amendatory thereof and supplemental thereto* to the present company, the Oregon & California Railroad Company, and then dissolved. The Oregon & California Railroad Company accepted the transfer and by resolution accepted the act of 1866 and amendments thereto and "all the benefits and emoluments therein and thereof granted, and upon the terms and conditions therein specified," and authorized the assent to be filed in the office of the Secretary of the Interior.

It is too late to declare such formal and repeated action to have been unnecessary. Every advantage was obtained, and while enjoying the benefit of it the obligations of it cannot be denied. Had there been an assertion of rights against the act of 1869 and had there been an immediate rejection of its provisions and obligations, the questions in the present case would not now be submitted for solution. It is possible to suppose that no patents to lands would have been issued, or at any rate the Government's attention would have been challenged to the assertion of rights which it might have contested from a position of supreme advantage.

(2) It is contended that if sales were made under the

limitations of the provisos the breaches were acquiesced in, and for this the action and knowledge of the officers of the Government are adduced—indeed, the knowledge of Congress itself; and reciting what was done under the grants, counsel say: "It is a story of mortgages and sales, executory contracts and conveyances, and a stream of Government patents flowing in between. These things were known of all; they were matters of common knowledge, notoriety, of public record; the railroad knew them;. the people knew them, the Government knew them." And cases are cited which, it is contended, establish that such circumstances might work an estoppel even against the Government, which, when it appears in court, it is contended, is bound like other suitors, and certainly establish that for more than forty years in the view of the executive officers the provisos were not conditions subsequent. Granting their strength in that regard, granting they have some strength in every regard, they have not controlling force, considering the provisos as simple covenants. And they cannot be asserted as an estoppel. No one was deceived, at least no one should have been deceived; no action was or should have been induced by them that could plead ignorance of the provisions and immunity from their responsibility. The recited conduct had explanation and notice in the opinions of the Department of the Interior. They are entirely consistent with the belief expressed by Mr. Ballinger, then Commissioner, afterwards Secretary of the Interior, that their enforcement was a matter for the courts, not for executive or legislative action.

Mr. Ballinger, in a communication to a member of the House of Representatives, expressed the view that "as soon as the title vested in the company [and it was his view that it had vested by the construction of the railroad], jurisdiction over the lands passed from the executive branch of the Government, and the enforcement of the

provision [the sale of lands to actual settlers] rests with the courts, through appropriate action by either the settlers entitled to purchase or by the Government, acting through the Department of Justice." And a doubt was expressed of the power of Congress to compel compliance with the provision. This was the position of the Department in 1907. It was not new or sudden. It was the repetition of the declaration of a much earlier time.

In an early day of the grant—1872—a communication was addressed by the then Attorney General to the Commissioner of the Land Office, accompanied by a letter from the president of the European & Oregon Land Company (this company was made a trustee of the lands granted under the acts of 1866 and 1869 to secure a bond issue of the company), in which it was stated that the board of trustees of the company, in accordance with a legal opinion given to it, had ordered that persons who had become *actual settlers* between July 25, 1866, and April 10, 1869, should have the privilege of purchasing according to the proviso, "but as to *all others* the company was not legally restricted from selling on liberal terms, for cash or credit, at reasonable rates." A request was made for an approval of the construction, and that the company be authorized "to sell on such terms as may be reasonable and just to all parties without any restrictions." This letter was submitted to the then Secretary of the Interior Mr. Delano, who replied "that the proviso *means just what it says*," "'that the lands be sold to actual settlers only'" in the designated quantities and for the designated prices; that the legislative intention was plainly to prevent the lands being held for speculative prices or disposed of to others than actual settlers, and that to construe the proviso as requested would in his "judgment utterly defeat such intention."

It being objected that the case was not submitted for decision or opinion, the Secretary replied that it was so

regarded and that the opinion could not be formally withdrawn.  He, however, expressed his willingness at any time on application to reopen the case and to hear all arguments which the company might desire to present. The opportunity was never taken advantage of, but the company proceeded upon its own construction of the proviso.

These views explain the attitude of the Department and give different color and meaning to its action than those assigned to it by the railroad company, and if the company disagreed with or defied the Department it cannot claim to have been deceived.  The views of the Department were no doubt the views of Congress, and its action and reluctance to prejudge are exhibited in the resolution of April 30, 1908, under which this suit was brought.   It refused, as we have seen, to determine peremptorily the rights of the United States or to anticipate judicial action.

We may observe again that the acts of Congress are laws as well as grants and have the constancy of laws as well as their command and are operative and obligatory until repealed.  This comment applies to and answers all the other contentions of the railroad company based on waiver, acquiescence and estoppel and even to the defenses of laches and the statute of limitations.  The laws which are urged as giving such defenses and as taking away or modifying the remedies under review have no application.  It would extend this opinion too much to enter upon their discussion.

A word of comment may be made upon one of the acts adduced as constituting a waiver of the breaches of the covenants, that is, upon the act passed August 20, 1912 (c. 311, 37 Stat. 320), it being supplemental to the joint resolution of April 30, 1908, *supra*.  It was passed after this suit was commenced and brought forward with the other acts by an amendment to the answer.  Counsel as-

sert of it substantially as alleged in the answer that it "is
a recognition of the non-settlement character of the lands
involved, and that such lands, at the time they were sold
to the so-called innocent purchasers described in forty-five
suits brought by the United States against said purchasers
and these defendants in this court, are unfit for settlement
and were so unfit for settlement and could not be sold to
actual settlers at the time they were sold by the company
to such purchasers."

We have answered the contention so far as it depends
upon the character of the lands. The character of the
lands furnished no excuse. It might have justified non-
action, but it did not justify antagonistic action. More-
over the act, while it authorized compromises with
purchasers from the company, explicitly excluded the ap-
plication of the provision to lands in the present suit and
declared that it should create no "rights or privileges what-
ever in favor of any of the defendants therein" and that
nothing in the act should condone any of the breaches of
the conditions or provisions of the granting acts nor be a
waiver of any cause of action or remedy of the United
States on account of any such breach or breaches or of
any right or remedy existing in favor of the United States.[1]

With the provisos as conditions subsequent out of the
way, the suit remains one to enforce a continuing cove-
nant. It is not a suit to vacate and annul patents.

---

[1] "Sec. 6. That nothing in this act contained, nor action taken pur-
suant to the provisions of this Act, shall be construed as a condonation
of any of the breaches of any of the conditions or provisions annexed
to any of the grants designated in said joint resolution approved April
thirtieth, nineteen hundred and eight, nor as a waiver of any of said
conditions or provisions, nor as a waiver of any right of forfeiture in
favor of the United States on account of any breach or breaches of
any of said conditions, nor as a waiver of any cause of action or remedy
of the United States on account of any breach or breaches of any said
conditions or provisions, nor as a waiver of any other rights or remedies
existing in favor of the United States."

(3) There is a special contention, given the pretension of a separate brief, that the "Sinking Fund Act of Congress of May 7, 1878, ratified the transfer of the California & Oregon Railroad and its land in California·to the Central Pacific Company, and operated to abrogate the 'Settlers Clause' contained in the acts of April 10, 1869, and May 4, 1870." The argument to support the contention is that the Central Pacific Railroad Company became, with the consent of Congress, the owner of the California & Oregon Railroad (to avoid confusion this company must be kept distinct from the defendant Oregon & California Railroad) in 1870, and that after such transfer and date it became impossible for the latter company to sell the lands for the prescribed price, or for any other price, or to settlers in any quantities, "for the reason that the company had parted with its title to the entire grant, and this was recognized, approved and validated by the United States." The contention seems to be directed more to the settlers' clause viewed as a condition subsequent than to it considered as a covenant. It is, however, said that the clause "has been entirely abrogated by said legislation and the acts of the Government." We are not impressed by the contention. It seems to be a tardy claim in the case and is the dare of an extreme ingenuity against the admissions and averments of the answers and many assertions which the record contains of ownership of and dominion over the lands by the Oregon and California Company and of their disposition by it. Indeed, it is opposed to the whole scheme of the suit and the defenses to it and to the stipulation of the parties. It there appears that after the designated date patents were applied for and issued to the Oregon & California Railroad Company, defendant herein, for 323,078.68 acres of land, over 163,000 acres of which were sold by that company to actual settlers. Indeed, all of the activities in the administration of the grants were those of the Oregon & California

Railroad. It made contracts and executed deeds for par-
ticular parcels; it made trust deeds for the whole of them;
it went into receivership and emerged from it to resume
its activities, and made the reports to Congress upon
which it bases the acquiescence of the Government in the
breaches of the provisos.

It is true that there appears in the stipulation the con-
fusion of a statement that there was an amalgamation
and consolidation of the Central Pacific, Western Pacific
and Oregon Central Railroad Companies into the Central
Pacific Company and that at the time the articles of
amalgamation and consolidation were filed (June 23, 1870)
the California & Oregon Railroad Company "was the
owner of all unsold lands in California" granted by the
act of July 25, 1866; that from the date of filing such
articles of amalgamation and consolidation the Central
Pacific Railroad Company remained owner of all of the
lands granted by the act of 1866 and two other acts
which made grants to the latter company until 1899, when
what remained unsold of the lands were granted to the
Central Pacific Railway. But it is stipulated that the
statements "concerning the ownership and conveyance of
the lands granted by said acts of Congress are made sub-
ject to the terms and provisions of said acts of Congress
respectively, and all rights of the United States there-
under—the title to said lands not being an issue in the
suit at bar." Why these facts were stipulated it is hard
to guess, but it is certain they cannot be given effect
against all other facts stipulated. It will be observed the
stipulation is concerned only with the California & Oregon
Railroad, not with the defendant Oregon & California
Railroad. The explanation of the Government is, there-
fore, correct that the Oregon part of the grant was by
the grant itself treated as substantially distinct from the
California part and that the Oregon part has always been
claimed, used and enjoyed by defendant, the Oregon &

California Railroad Company or its predecessors in title, and never by the Central Pacific.

The provisos of the acts having been thus established as covenants, not conditions subsequent, between the Government and the defendants, and their continuing obligation determined, we are brought to the consideration of the rights of the cross complainants and interveners thereunder.

It may be said that in some of the aspects of our discussion there was implication against their contentions, but it also may be said there is implication for them. Undoubtedly the provisos expressed the policy of the settlement of the lands and a sale to settlers, but the cross complainants and interveners assert a right more definite—a trust, indeed, and personal—of compulsory obligation upon the railroad company, to be enforced in individual suits.

Snyder and 63 others, alleging themselves to be *actual* settlers upon specified lands, brought suits nearly a year before the present suit was commenced. They were brought into this suit and are now here as cross complainants. They pray that the grants be declared to be grants in trust and ask for protection, "whatever form of decree may be entered." They further ask "that receivers or trustees be appointed, whose duty it shall be to formulate, with the approval of the District Court, suitable rules and regulations for the sale of all the lands here involved, in accordance with the acts of Congress making the grants." They deny having anything in common with the interveners, and, as we have seen, vigorously attack the claim of the Government for a forfeiture of the grants.

The interveners concur with the cross complainants that the acts created a trust but assert that they have a broader extent. In other words, and as their counsel express it, the intention of Congress was to create a trust

in the granted lands for the benefit of those who might desire to acquire title thereto, that is, not actual settlement was the condition of purchase, but an intention to settle, with the qualification to do so.

Here, then, is a conflict between the asserted beneficiaries of the asserted trust—whether *actual* settlers, as cross complainants contend, or *applicants* for settlement, as the interveners insist. The distinction would seem to be real and cannot be confounded. The word "actual" expresses a settlement completed, not simply contemplated or possible. Upon the express words of the provisos it would seem that interveners' claims to be beneficiaries of the trust, if there is a trust, must be refuted.

The cross complainants present arguments of more difficulty, supported by appealing considerations. "Actual settlers" are the words of the provisos, and we may assume actual settlers were contemplated and sales of the lands were restricted to them; but how were actual settlers to be ascertained, and by whom? And was there a compulsion or option as to sales? There could not be an absolute right to settle or purchase unless there was an absolute compulsion to sell. The acts of Congress omit regulation. Their language is not directive; it is restrictive only. With this exception the grant is unqualified. The lands were granted to aid in the construction of the road and while it is a certain inference that disposition of them was contemplated, necessarily there was conferred a discretion as to time. There was certainly no limitation of it expressed.

The contending considerations we have already stated and their respective weights, and decision must necessarily turn upon a judgment of the purposes of the granting acts, and in what manner they were intended to be accomplished, not of the provisos alone. There is plausibility in the argument which represents that if the pro-

visos be held to give to the railroad a discretion of sale, the choice of time and settlers, their requirement is impotent, and instead of securing settlement would prevent it; instead of devoting the lands to development, retain them in monopoly and a kind of mortmain.

We feel the strength of the argument but cannot yield to it. There are countervailing ones. We have already indicated that nothing can be deduced from the imperfections of the granting acts. Indeed, the argument of cross complainants, like a great many other contentions in the case get their plausibility from the abuses of the granting acts, not their uses. We have seen that in the early days of the grants settlements were normally made and the railroad, in the exercise of its discretion, responded to such settlement by sales to settlers.

There was no embarrassment then in the selection of settlers and no question by anybody that there was a discretion of sale on the part of the railroad company. A denial came later and the assertion of a peremptory right against the company of settlement and purchase, both to be acquired by an intrusion upon the company's possession, if it can be said to have had possession. Of course, the delay in the assertion of a right is not conclusive against its existence. There is, however, argument in it, and if it may be said that settlers were not in such numbers and urgency as to bring their rights to attention and assertion, a conjecture may be engendered that some other purpose than the acquisition of homes has led to a denial of rights which no one theretofore had questioned. It is asserted that not a desire of settlement but the rise in the price of lumber has created an eager demand for the lands.

There are, however, further considerations. By the acts of 1866 and 1870 it is provided that upon the survey and location of the roads the Government shall withdraw from sale the granted lands; and the provision would

seem to withdraw the lands from the specific operation of the land laws and certainly from a complete analogy to them. The public land laws had test of the qualification of settlers under them; they had also the machinery of proof and precaution. When the granted lands were withdrawn from those laws and primarily devoted to another purpose they were committed to another power, to be administered for such purpose, and a discretion in the exercise of the power, within the restriction imposed, was necessarily conferred. This purpose we have sufficiently estimated. Nor need we pause to consider the differences between charitable trusts and other trusts, the class, not individual interest, which the former must have, as it is contended, and the certainty in the beneficiaries which the cases have assigned to the latter. And certainly the words "actual settlers" indicate no particular individuals. They describe a class or body of individuals without habitation or name. As Judge Wolverton, in his opinion in the District Court (186 Fed. Rep. 861, 910), said: "There could be no actual settler until an actual habitation was established upon some specific parcel of this land. Logically, no one is a *cestui que trust* under the theory until and unless he becomes such a settler. This is a palpable demonstration of the uncertainty as to the beneficiary, for who, of the vast concourse of humanity, is going to come and claim the right and privilege of settling upon the land?" We cannot construe the grants as confined or encumbered by rights so indefinite.

There was a complete and absolute grant to the railroad company with power to sell, limited only as prescribed, and we agree with the Government that the company "might choose the actual settler; might sell for any price not exceeding $2.50 an acre; might sell in quantities of 40, 60, or 100 acres, or any amount not exceeding 160 acres." And we add, it might choose

the time for selling or its use of the grants as a means of credit,. subject ultimately to the restrictions imposed; and we say "restrictions imposed" to reject the contention of the railroad company that an implication of the power to mortgage the lands carried a right to sell on foreclosure divested of the obligations of the provisos.

To use the grant for credit might become, indeed did become, a necessity. The construction of the road halted for funds. They were raised by trust deeds, as we have seen. The accomplishment of the purpose of the grants determines, we repeat, against the creation of a trust.

In conclusion we cannot refrain from repeating that the case in its main principles is not in great compass. It has been given pretension and complexity by the happening of the unforeseen, the lapse of time, change of conditions and the contests of interests. These, however, are but accidents, giving perplexity and prolixity to discussion. Judgment is independent of them. It is determined by the simple words of the acts of Congress, not only regarded as grants but as laws and accepted as both; granting rights but imposing obligations—rights quite definite, obligations as much so. The first had the means of acquisition; the second, of performance; and, as we have pointed out, whatever the difficulties of performance, relief could have been applied for and, it might be, have been secured through an appeal to Congress. Certainly evasion of the laws or the defiance of them should not have been resorted to.

Nor can their obligation be magnified by looking backwards, by the results achieved rather than when they were only hoped for, by conditions of which there was not even prophecy.

We have seen that one company failed under the burdens which it assumed. The other company took it up and struggled for years under it and its own burden. It may, indeed, have finally succeeded by a disregard of

the provisos. It might, however, have succeeded by a strict observance of them. We are not required to decide between the suppositions. We can only enforce the provisos as written, not relieve from them.

For the same reason we cannot at the instance of the Government give a greater sanction to them than Congress intended, nor give to cross complainants and interveners a right which the granting acts did not confer upon them.

Rejecting, then, the contention of the Government and the contentions of the cross complainants and interveners and regarding the settlers clauses as enforceable covenants, what shall be the judgment? A reversal of the decree of the District Court, of course, and clearly an injunction against further violations of the covenants. There certainly should be no repetition of them. What they were the record exhibits.

We need not comment on them or point out how opposed they were to the covenants, how antagonistic to the policy and purpose of the Government expressed in the covenants. The contrast of a sale to a single purchaser of 160 acres (the maximum amount) with a sale of 1000, 2000, 20,000 and 45,000 acres to a single purchaser needs no emphasis; nor the contrast of a use of the lands to establish homes with their use for immediate or speculative enterprises.

In view of such disregard of the covenants, and gain of illegal emolument, and in view of the Government's interest in the exact observance of them, it might seem that restriction upon the future conduct of the railroad company and its various agencies is imperfect relief; but the Government has not asked for more.

In its bill it has distinguished between the sold and unsold lands and between the respective rights and interest, vested, contingent or expectant, in them; and while it is asserted that all have become forfeited, only the unsold

lands and the rights and interest in them are included in this suit. And the reason is given that the purchasers were many, the names and places of residence of only a few of them were known and the names of the others could not have been ascertained in time to make them parties to the suit. Besides, that such purchases and interests were made and acquired under greatly varying circumstances and that it would be inequitable to make a few purchasers representatives of all, and to make all parties would postpone and might ultimately defeat the public interests. That, therefore, this suit was brought, it is alleged, to determine the rights and remedies as to the unsold lands and that subsequently other suits will be instituted as to the sold lands, rights and remedies as to them being in effect reserved.

Therefore, the decree in this suit shall be without prejudice to any other suits, rights or remedies which the Government may have by law or under the joint resolution of April 30, 1908 (Res. 18, 35 Stat. 571), or under the act of Congress passed August 20, 1912 (c. 311, 37 Stat. 320).

However, an injunction simply against future violations of the covenants, or, to put it another way, simply mandatory of their requirements, will not afford the measure of relief to which the facts of the case entitle the Government.

The Government alleged in its bill that more than 1000 persons had made application to purchase from the railroad company in conformity to the covenants. In answering the defendants averred that such applications were made by persons who desired to obtain title on account of the timber and not otherwise, and for the purpose of speculation only and not in good faith as actual settlers. And it was averred that the lands were chiefly and in most instances solely of value because of the timber thereon and were not fit for actual settlement. And, further, that the lands capable of actual settlement and the establishment of

homes thereon at no time "exceeded (approximately)
300,000 acres, consisting of small and widely separated
tracts, all of which were sold to actual settlers or persons
claiming to be such during construction and prior to
completion, respectively, of said railroads, in quantities of
160 acres or less to a single purchaser, at prices not exceed-
ing $2.50 per acre."

A great deal of testimony was introduced, consisting
not only of that of witnesses but of maps, photographs,
reports and publications, which tended to establish the
asserted character of the lands. And there was evidence
in rebuttal. We cannot pause to determine the relative
probative force of the opposing testimonies. It is, how-
ever, clear, even from the Government's summary of the
evidence, that lands which may be fit for cultivation have
a greater value on account of the timber which is upon
them. Besides, for our present purpose we may accept
the assertion of defendants; and we have seen that Con-
gress extended the Timber and Stone Act to the reserved
lands, and, by the act of August 20, 1912, *supra*, it has
withdrawn from entry or the initiation of any right what-
ever under any of the public land laws of the United States
the lands which might revert to the United States by reason
of this suit.

This, then, being the situation resulting from conditions
now existing, incident, it may be, to the prolonged disre-
gard of the covenants by the railroad company, the lands
invite now more to speculation than to settlement, and we
think, therefore, that the railroad company should not
only be enjoined from sales in violation of the covenants,
but enjoined from any disposition of them whatever or of
the timber thereon and from cutting or authorizing the
cutting or removal of any of the timber thereon, until
Congress shall have a reasonable opportunity to provide
by legislation for their disposition in accordance with
such policy as it may deem fitting under the circumstances

and at the same time secure to the defendants all the value the granting acts conferred upon the railroads.

If Congress does not make such provision the defendants may apply to the District Court within a reasonable time, not less than six months, from the entry of the decree herein, for a modification of so much of the injunction herein ordered as enjoins any disposition of the lands and timber until Congress shall act, and the court in its discretion may modify the decree accordingly.

*Decree reversed and cause remanded to the District Court for further proceedings in accordance with this opinion.*

MR. JUSTICE McREYNOLDS took no part in the consideration and decision of the case.