638 F.2d 1154
 Stan SKOKO, Thomas Telford and Robert Schumacher, Board of
County Commissioners, on behalf of Clackamas
County, Oregon, a Political Subdivision
of the State of Oregon,
Plaintiffs-Appellants,
v.
Cecil D. ANDRUS (successor to Thomas Kleppe), Secretary of
the Interior of the United States, and W. Michael Blumenthal
(successor to William Simon), Secretary of the Treasury of
the United States, Defendants-Appellees,
and
Jeanette Simerville, Larry Callahan and Dale D. Schrock,
Board of County Commissioners, on behalf of Benton
County, Oregon, et al., Intervenor-
Defendants-Appellees.
 No. 76-3722.
 United States Court of Appeals,
Ninth Circuit.
 March 9, 1979.
Certiorari Denied Oct. 29, 1979. See 100 S.Ct. 266.
 
 Donald C. Walker (argued), Portland, Or., Kenneth E. Shetterly, Dallas, Or., for plaintiffs-appellants.
 John R. Faust, Jr., Portland, Or., Charles E. Biblowit (argued), Washington, D. C., for defendants-appellees.
 Appeal from the United States District Court for the District of Oregon.
 Before DUNIWAY and CHOY, Circuit Judges, and GRANT,* District Judge.
 DUNIWAY, Circuit Judge:
 
 
 1
 There is no merit in this appeal.
 
 
 2
 Between 1866 and 1870, Congress granted almost 4,000,000 acres of land to the Oregon & California Railroad to promote the construction of a railroad from Portland, Oregon, to the California Border. The granting statutes contained a proviso, "That the lands granted . .. shall be sold to actual settlers only in quantities not greater than one quarter section to one purchaser, and for a price not exceeding two dollars and fifty cents per acre." Oregon & California Railroad Co. v. United States, 1915, 238 U.S. 393, 403, 35 S.Ct. 908, 913, 59 L.Ed. 1360.
 
 
 3
 The railroad was built, but the proviso was violated. As a result, Congress, by joint resolution, directed the Attorney General to enforce the proviso. 35 Stat. 571 (1908). In the ensuing action, supra, the Court held that the proviso was a covenant, not a condition. It therefore refused to forfeit the lands still owned by the railroad, ordered the covenant enforced, and gave Congress "a reasonable time" to frame the remedy. Id. at 438-39, 35 S.Ct. 908.
 
 
 4
 Congress responded with the Chamberlain-Ferris Revestment Act of June 9, 1916, 39 Stat. 218, which declared all undisposed of grant lands "hereby, revested in the United States." 39 Stat. 219. Congress further established a procedure to compensate the railroad for the grant lands thus revested. The Court upheld the remedy in Oregon & California Railroad Co. v. United States, 1917, 243 U.S. 549, 37 S.Ct. 443, 61 L.Ed. 890.
 
 
 5
 The Revestment Act also established the "Oregon & California land-grant fund" (hereafter "the O & C fund") within the United States Treasury. Since that time all revenues that the United States has derived from the former grant lands have been paid into the fund. A series of Congressionally enacted formulae has controlled distributions from the O & C fund.
 
 
 6
 However, there is nothing in the Revestment Act, nor in subsequent acts, nor in the decisions of the Supreme Court, that purports to subject the lands to a trust in favor of the Oregon counties, or to create a contract between Congress and the counties entitling the latter to any moneys from the fund. Title to the revested lands was established in the United States, subject to no restrictions, covenants or conditions whatever. The lands became part of the public domain. See Clackamas County, Oregon v. McKay, 1955, 96 U.S.App.D.C. 385, 387, 226 F.2d 343, 345.
 
 
 7
 The Revestment Act provided a three-part distribution. First, the fund was to be used to pay the railroad the amounts due it. Second, the fund was to reimburse the United States for having paid 18 Oregon Counties ("the O & C Counties") back taxes the railroad had owed on grant lands located within those counties when they were revested. Third, once these payments had been made the fund would then be distributed 25% to the O & C Counties, 25% to the state of Oregon, 40% to the reclamation fund in the United States Treasury created by § 1 of the 1902 Reclamation Act, 43 U.S.C. § 391, and 10% to the general fund in the United States Treasury. The railroad's claims have been paid in full, and it has no interest in this litigation.
 
 
 8
 Between 1916 and 1926, the United States derived little revenue from the O & C lands. As a result, the third stage payments to the counties never materialized. To assist the O & C counties, Congress passed the Stanfield Act of July 13, 1926, 44 Stat. Part 2, 915. It provided for payments from the general fund of the Treasury in lieu of taxes. It also provided that those payments would be an aggregating reimbursable charge against the O & C fund. Thus, before O & C fund moneys could go to the counties under the third stage of the Revestment Act formula, the O & C fund had to reimburse the general fund for all of the general fund payments to the Counties in lieu of taxes. Between 1926 and 1937, the general fund payments in lieu of taxes exceeded the revenues from the O & C lands with the result that the excess general fund payments became an ever-increasing reimbursable charge against the O & C fund.
 
 
 9
 In 1937 Congress passed the O & C Sustained Yield (or McNary) Act, 50 Stat. 874, 43 U.S.C. § 1181a, which provided that most of the O & C lands would henceforth be managed for sustained-yield timber production. Title II of the Act, the focus of the dispute in this case, completely restructured the distribution of O & C revenues. Repealing all prior conflicting statutes, it divided the O & C fund's annual revenues into three parts, a first 50%, a first 25%, and a second 25%.
 
 
 10
 The first 50% was to go outright to the O & C counties. The first 25% was to go initially to cover the Stanfield Act payments in lieu of taxes accruing through March 1, 1938. Next, this first 25% would go into the Treasury's general fund to begin paying off the reimbursable charges which had accumulated against the O & C fund because in previous years the payments in lieu of taxes had exceeded total O & C revenues. Finally, when all the reimbursable charges had been taken care of, the counties were to get this first 25% portion in addition to the first 50% portion for an eventual total of 75%.
 
 
 11
 The last 25% was to be available for the administration of the sustained yield program in such amounts as Congress determined. Any part of this second 25% not used for administering the program was to go into the Treasury's general fund to be first applied to satisfy any still outstanding reimbursable charges against the O & C fund.
 
 
 12
 The reimbursable charges had been paid off by 1951. Thus, in 1952 the O & C counties began to receive a full 75% of the O & C fund revenues, the first 50% plus the first 25%, as provided by 43 U.S.C. § 1181f(b).
 
 
 13
 Since 1953 the counties have received shares ranging from 50 to 64%. Appellant County Commissioners assert that § 1181f(b) has entitled them to a full 75% in every year since 1953. Alleging that the differences between the full 75% and the percentages received have over the past 25 years amounted to over $180,000,000, appellants seek an order requiring the Secretaries to pay over that amount to the O & C counties.
 
 
 14
 The Secretaries concede that the terms of § 1181f(b) would have given the counties a 75% share beginning in 1953, absent later legislation. However, a proviso contained in 25 consecutive Interior Department appropriation acts since 1953 has annually amended § 1181f(b) to require the Secretaries to pay out the lesser shares challenged by appellants. We agree that the annual Appropriation Act provisos have amended § 1181f(b) to limit the counties to the lesser shares.
 
 
 15
 Since 1960, Congress has annually appropriated 25% of the O & C revenues for the management of the O & C lands. Appellant Commissioners argue that the Secretaries should have paid these management expenses out of the second 25% of the O & C funds, leaving the first 25% fully available to be added onto the first 50% going to the O & C counties. This construction is plainly wrong because each appropriation act has provided, in essence, that the first 25% must be paid into the general fund of the Treasury.
 
 The critical proviso reads:
 
 16
 * * * Provided further, That the amount appropriated herein is hereby made a reimbursable charge against the Oregon and California land grant fund and shall be reimbursed to the general fund in the Treasury in accordance with the provisions of the second paragraph of subsection (b) of title II of the Act of August 28, 1937. (50 Stat. 876)
 
 
 17
 89 Stat. 978.
 
 
 18
 The second paragraph of subsection (b) of title II of the Act of August 28, 1937, provides that
 
 
 19
 (the first) 25 per centum shall be accredited annually to the general fund in the Treasury of the United States until all reimbursable charges against the Oregon & California land-grant fund owing to the general fund in the Treasury have been paid . . . . When the general fund in the Treasury has been fully reimbursed for the expenditures which were made charges against the Oregon & California land-grant fund said 25 per centum shall be paid annually . . . to the several counties . . .
 
 
 20
 While the appropriated management expenses initially come out of the second 25% of the O & C revenues in accordance with 43 U.S.C. § 1181f(c), the proviso makes it clear that those management expenses become a reimbursable charge against the O & C fund. Reimbursing the general fund in accordance with the second paragraph of subsection (b) means paying the first 25% revenues into the general fund until the amount paid in covers the amount of the second 25% appropriated for management and improvements. When, as has happened since 1960, Congress appropriates the entire second 25% for management and improvements, the Secretaries must pay the entire first 25% into the general fund to comply with the second paragraph of subsection (b). When the entire first 25% must be paid into the general fund to fully reimburse the charges, no first 25% funds remain to be paid to the counties who thus must be satisfied with the first 50% of the O & C fund revenues.[1] Congress has inserted the same provision in every Appropriation Act since 1960.[2]
 
 
 21
 Once the O & C lands revested in the United States under the Chamberlain-Ferris Revestment Act of 1916, the O & C lands and their revenues became exclusively the property of the United States. Clackamas County, Oregon v. McKay, supra, 96 U.S.App.D.C. 385, 387, 226 F.2d 343, 345. Congress had the power to decide what portion of the O & C revenues, if any, to distribute to the counties. As the District of Columbia Circuit explained in an earlier lawsuit involving these same lands,
 
 
 22
 . . . The courts cannot interfere with the administration of public property as arranged by the Congress and the Executive, so long as constitutional boundaries are not transgressed by either branch or statutory ones by the latter.
 
 
 23
 Clackamas County, Oregon v. McKay, supra, 96 U.S.App.D.C. at 388, 226 F.2d at 346.
 
 
 24
 When the United States reacquired the property it became exempt from state and local taxes, and the former taxing bodies had no compensable rights against the United States. The O & C counties had "nothing more than an expectation of collecting future taxes on the parcel(s) in question. That such an expectation is not a compensable interest in a condemned parcel is well settled since to permit a state or a municipality to recover on such a claim would violate the long recognized immunity of the federal government from the taxing power of the states." United States v. 6.321 Acres of Land, Etc., Suffolt County, 1 Cir., 1973, 479 F.2d 404, 406. See also, United States v. City of Glen Cove, E.D.N.Y., 1971, 322 F.Supp. 149, 155, aff'd, 2 Cir., 1971, 450 F.2d 884; cf. Mullen Benevolent Corp. v. United States, 1933, 290 U.S. 89, 94-95, 54 S.Ct. 38, 78 L.Ed. 192; Adaman Mutual Water Company v. United States, 9 Cir., 1960, 278 F.2d 842, 849-50; Columbia Irrigation District v. United States, 9 Cir., 1959, 268 F.2d 128, 131-32.
 
 
 25
 Whatever the Congress did to alleviate the loss of tax revenues suffered by the O & C counties when the O & C lands were revested in the United States was an act of grace on the part of the Congress. It conferred no rights upon the counties to the continuance of Congress' bounty. Congress could amend or repeal the Act in question without infringing any right of the counties.
 
 
 26
 The amendments contained in the appropriation acts are valid. The Secretaries have complied with them.
 
 
 27
 Appellants excoriate Congress for using appropriation acts as its vehicles to alter the effects of the McNary Act. It is well settled that Congress can amend substantive legislation by including appropriate language in appropriations bills. United States v. Dickerson, 1940, 310 U.S. 554, 555, 60 S.Ct. 1034, 84 L.Ed. 1356; City of Los Angeles v. Adams, 1977, 181 U.S.App.D.C. 163, 171-172, 556 F.2d 40, 48-49; National Labor Relations Board v. Thompson Products, 9 Cir., 1944, 141 F.2d 794, 797-99.
 
 
 28
 The appellants have no case.
 
 
 29
 Affirmed.
 
 
 
 *
 The Honorable Robert A. Grant, Senior United States District Judge for the Northern District of Indiana, sitting by designation
 
 
 [1]
 Between 1953 and 1959, Congress appropriated fixed dollar amounts for improvements instead of appropriating a full 25%. Since the first 25% revenues exceeded the fixed dollar amounts in each of those years, a portion of that first 25% remained for distribution to the counties after the general fund had been fully reimbursed. Thus the counties received an extra 1 to 14% of O & C fund revenues during this period
 
 
 [2]
 
 Fiscal
 Year Citation
 ------ ----------------
 1976 89 Stat. 978
 1975 88 Stat. 803
 1974 87 Stat. 429
 1973 86 Stat. 508
 1972 85 Stat. 229-230
 1971 84 Stat. 669-670
 1970 83 Stat. 147-148
 1969 82 Stat. 426
 1968 81 Stat. 59-60
 1967 80 Stat. 170-171
 1966 79 Stat. 174-175
 1965 78 Stat. 273
 1964 77 Stat. 97
 1963 76 Stat. 335
 1962 75 Stat. 246
 1961 74 Stat. 105
 1960 73 Stat. 93