HEADWATERS, INC.,
Plaintiff–Appellant,

v.

BUREAU OF LAND MANAGEMENT,
MEDFORD DISTRICT; David A.
Jones, District Manager, in his official
capacity; Croman Corporation, Defen-
dants–Appellees,

Association of O & C Counties,
Defendant–Intervenor–Appellee.

No. 89–35688.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 9, 1990.

Decided Sept. 10, 1990.

Charles G. Levin, Ashland, Or., for plaintiff-appellant.

Angus E. Crane, Dept. of Justice, Washington, D.C.; Michael E. Haglund, Haglund & Kirtley, and Phillip D. Chadsey, Stoel Rives Boley Jones & Grey, Portland, Or., for defendants-appellees.

Before WALLACE, FERGUSON and BRUNETTI, Circuit Judges.

WALLACE, Circuit Judge:

Headwaters, Inc. (Headwaters) appeals from a judgment in favor of the Bureau of

Land Management (BLM) and Croman Corp., and intervenor Association of O & C Counties. Following a bench trial, the district court held that the BLM sale of certain timber resources in southern Oregon did not violate the National Environmental Protection Act (NEPA) and various related statutes. The district court had jurisdiction pursuant to 28 U.S.C. § 1331, and we have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We affirm.

## I

The BLM, an agency of the United States Department of the Interior, manages timber lands in parts of southern Oregon. The timber at issue here is the Wilcox Peak sale area, which lies within the BLM-managed Jackson and Klamath Sustained Yield Unit (Unit). In 1979, the BLM published a Timber Management Plan Environmental Impact Statement (EIS) for the Unit. The plan envisioned management of the Unit to allow substantial cutting of timber on a sustained yield basis. The plan also considered the environmental consequences of the timber management, and recommended various practices to reduce the ill-effects of the harvesting. The BLM issued a supplemental EIS (SEIS) in 1985 to consider the effects of alternative harvesting techniques in the Unit.

In 1986, the BLM prepared a site-specific Environmental Assessment (EA) considering the environmental impacts of permitting the sale and logging of the Wilcox Peak timber. The EA concluded that the impacts were within those anticipated by the regional EIS, that the Wilcox Peak area did not present significant unique environmental concerns, and that therefore a site-specific SEIS for the Wilcox Peak sale was not required. After a public hearing, the BLM issued a Finding of No Significant Impact. It adopted the conclusion of the EA that the Wilcox Peak sale did not introduce environmental impacts beyond those already anticipated in the EIS. Thus, the BLM did not issue a site-specific SEIS for Wilcox Peak.

The BLM sold the Wilcox Peak timber to defendant Croman Corporation at auction in 1987. Headwaters, an environmental group, protested the sale. After exhausting administrative remedies, Headwaters filed this action in federal district court. Headwaters alleged a violation of NEPA due to the failure to file a site-specific SEIS, as well as various related statutory violations, and requested declaratory and injunctive relief. After a trial on the merits, the district court granted judgment for all defendants, holding that the BLM had not violated the statutory requirements in offering the sale.

## II

Headwaters's principal contention is that the BLM violated NEPA by failing to file an SEIS for the Wilcox Peak sale area. This challenge is twofold. First, Headwaters challenges the EA's conclusion that as of 1986 a site-specific SEIS was unnecessary. Headwaters asserts that the EA failed to consider adequately various impacts of the Wilcox Peak sale, including decreased water quality and damage to watersheds, increased fire hazards, and damage to the habitat of the northern spotted owl, a threatened species. Second, Headwaters points to evidence which has come to light since the filing of the EA indicating the importance of the Wilcox Peak area as a northern spotted owl habitat. As a result, Headwaters contends that the EA is outdated now, even if valid when filed.

### A.

■ NEPA requires federal agencies to file an EIS for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Federal agencies must prepare a SEIS in response to "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii) (1987); *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S.Ct. 1851, 1858 & n. 16, 104 L.Ed.2d 377 (1989) (*Marsh*). "[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would ren-

der agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Marsh*, 109 S.Ct. at 1859 (footnotes omitted). However, an agency is not free to ignore the possible significance of new information. Rather, NEPA requires that the agency take a "hard look" at the new information to determine whether an SEIS is necessary. *Id.* at 1859, 1865.

■ The agency decision whether new information requires an SEIS is reviewed under the arbitrary or capricious standard. *Id.* at 1860 (whether to file an SEIS "is a classic example of a factual dispute the resolution of which implicates substantial agency expertise").

> [I]n making the factual inquiry concerning whether an agency decision was "arbitrary or capricious," the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." This inquiry must "be searching and careful," but "the ultimate standard of review is a narrow one." When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive. On the other hand, in the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency[ ] ... without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information.

*Id.* at 1861, *quoting Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

We now review the judgment of the district court following a trial. Any findings of fact underlying the district court's decision are tested for clear error. We review de novo, however, the district court's conclusion as to whether the agency's decision

not to supplement the EIS was arbitrary or capricious. *Oregon Natural Resources Council v. Lyng*, 882 F.2d 1417, 1422 (9th Cir.1989) (*Lyng*), *amended*, 899 F.2d 1565 (9th Cir.1990).

### B.

■ We consider initially whether the BLM decision in 1986 not to file an SEIS for Wilcox Peak violated NEPA. Headwaters advances three arguments in contending that there was a violation.

### 1.

Headwaters draws our attention to testimony regarding the injurious effects of timber cutting such as planned in the Wilcox Peak area upon the northern spotted owl, a threatened species. Headwaters contends that this testimony should have been considered in a site-specific SEIS for Wilcox Peak. The BLM argues that such testimony does not constitute significant new evidence not already considered in the EIS.

The threat to northern spotted owls from the cutting of old-growth forests has been recognized for some time. The initial EIS for the Unit, prepared in 1979, discussed such threats. It states in part:

> The northern spotted owl is dependent on old-growth, closed canopy forests.... Additional northern spotted owls in excess of the eight pairs [given specific protection in the timber management plan] may have their habitat reduced or eliminated if it is in a sale area. The results of this action are unknown. However, if it is assumed that all lands are at carrying capacity, then it is likely these owls would be eliminated.

1979 EIS at 3–41. The EIS further stated:

> Habitat for old-growth dependent species [such as the northern spotted owl] would be eliminated on about 30,000 acres during the first decade. This acreage would never again support old-growth habitat under proposed management plans. Currently there are 23 known pairs of northern spotted owls residing in the [Unit]. Of these, 14 pairs occupy high intensity

forest lands and are not included in the 8 pairs scheduled to receive complete habitat protection.... If remaining habitat is at carrying capacity, then these 14 pairs of owls may be in jeopardy.

*Id.* at 7–1.

The BLM specifically adverted to the possibility that there might be northern spotted owls in the Wilcox Peak area in the site-specific EA. The BLM discussed the impact of cutting upon the owl habitat, and adopted various measures recommended in the EIS to mitigate the impact upon any owls in the area.

■ Where an environmental impact is "encompassed by the terms of the [regional] EIS," its site-specific effects "d[o] not constitute 'significant new circumstances' requiring a supplemental EIS under 40 C.F.R. § 1502.9(c)(2)(ii)." *Lyng*, 882 F.2d at 1423. In *Lyng*, an environmental group challenged a timber sale permitting salvage harvesting of trees killed in a beetle epidemic in the Duck Creek area of Hells Canyon National Recreation Area. The regional EIS for Hells Canyon had contemplated the effects of such salvage harvesting in general terms; in a site-specific EA, the relevant agency concluded that harvesting at Duck Creek did not present any site-specific concerns not addressed in the regional EIS. Upholding the decision not to file a site-specific SEIS for the Duck Creek sale, we stated: "A reasoned evaluation of the Duck Creek timber sale was provided in general terms by the EIS ... and in terms more specific to the Duck Creek area by the EA. The [agency's] decision not to prepare a supplemental EIS was well-grounded, not arbitrary and capricious." *Id.* at 1424.

Similarly, in this case the regional EIS adequately encompassed the threat to northern spotted owls posed by timber cutting of the type contemplated at Wilcox Peak. The EA considered the threat in site-specific terms, and reasonably concluded that the EIS encompassed all impacts posed by the Wilcox Peak sale. Headwaters has pointed to no significant information relating to northern spotted owls at Wilcox Peak which was known as of 1986 but not discussed in the regional EIS. As in *Lyng*, the decision not to file an SEIS with regard to northern spotted owls was not arbitrary or capricious.

2.

Headwaters also argues that a site-specific SEIS for Wilcox Peak was required for a reason unrelated to the northern spotted owls: the cutting in the sale area will affect streams and watershed through increased sedimentation, temperature changes, bank erosion, debris torrents, decreases in pools, and the use of fertilizers and pesticides.

The effects of logging and roadbuilding at Wilcox Peak were considered at length in various BLM documents. The EIS and SEIS for the regional timber management program addressed each of these issues. These documents recommended and adopted various general mitigating measures, such as required buffer zones around watercourses. Furthermore, the EA for the Wilcox Peak sale considered the site-specific effects upon watersheds, and discussed and specifically adopted most of the recommendations set forth in the general plan.

As observed earlier, when environmental effects are described in a regional EIS and discussed in site-specific EA, a site-specific SEIS will not be required unless significant new evidence not considered in the EIS is presented. *Id.* at 1423–24. Headwaters challenges many of the conclusions reached by the BLM, but these decisions are supported by the testimony of its experts, on whom the agency is entitled to rely. *Marsh*, 109 S.Ct. at 1861. Although Headwaters disputes the conclusions drawn in the EIS and EA and identifies favorable testimony, it has not pointed to any *significant* factual information not discussed generally in the EIS and specifically in the EA. Therefore, we hold that the BLM considered all relevant factors, and that it did not act arbitrarily or capriciously in determining that a site-specific SEIS addressing the impacts upon watersheds was not required. *Lyng*, 882 F.2d at 1423–24.

### 3.

■ Finally, Headwaters asserts that cutting in the Wilcox Peak area will increase fire hazards by removing fire-resistant old growth. Neither the Unit EIS nor the Wilcox Peak EA considered this potential impact. Headwaters argues that such an omission renders the EA fatally defective. The district court did not pass upon this contention, but we conclude that it is unnecessary to remand. Our recent decision in *Oregon Natural Resources v. Mohla*, 895 F.2d 627 (9th Cir.) (*Mohla*), cert. denied, —— U.S. ——, 110 S.Ct. 2621, 110 L.Ed.2d 642 (1990), forecloses Headwaters's argument.

*Mohla* dealt with the interpretation of Pub.L. No. 100–446 § 314, 102 Stat. 1825 (1988), reenacted as Pub.L. No. 101–121, § 312, 103 Stat. 743 (1989). As stated in *Mohla*, "[s]ection 314 bars challenges to a Forest Service plan 'on the sole basis that the plan in its entirety is outdated.' It permits challenges to 'any and all particular activities to be carried out under existing plans.'" *Id.* at 629; *see also Portland Audubon Society v. Lujan*, 884 F.2d 1233, 1237–40 (9th Cir.1989) (also interpreting § 314), cert. denied, —— U.S. ——, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1990). Headwaters's claim with regard to increased fire hazards is not, on its face, a challenge to the Unit timber management plan as a whole. However, unlike the concern over northern spotted owls and water quality, we are unable to discern any aspect of the alleged increase in fire danger which is even arguably site-specific. Removal of old growth at Wilcox Peak will have precisely the same effects upon fire danger as would removal of old growth elsewhere in the Unit. Headwaters shows nothing to the contrary.

In *Mohla*, we found a similar challenge barred by section 314.

> While [plaintiff's] challenge to the adequacy of this EA is couched in site-specific terms, the suit, if successful, would enable the plaintiffs to challenge, sale by sale, the entire ... Timber Management Plan on the ground that the EAs failed to take into account new information. Such challenges would amount to an attack on the entire plan as outdated because it failed to take into account recent ecological studies of the value of old-growth forests.

*Id.* at 630.

Here Headwaters challenges a site-specific EA on grounds which also could be equally applicable to all sales under the management plan. Such a challenge is barred by section 314 and our decision in *Mohla*.

### C.

■ Headwaters next argues that even if no SEIS was required at the time the EA was issued, new information has been discovered rendering the EA outdated. Headwaters points to two new pieces of information which suggest the need for a site-specific SEIS for the Wilcox Peak area. First, a breeding pair of northern spotted owls was sighted in the Wilcox Peak area after the issuance of the EA. Previously it was not known whether northern spotted owls inhabited the Wilcox Peak area. According to Headwaters's experts, proceeding with the Wilcox Peak sale would increase the risk of mortality to this pair, and would significantly reduce their chances for successful breeding. Second, Headwaters points to testimony by Charles Sisco, based primarily upon a model of owl demographics developed by Dr. Lande. According to this new testimony, the owls are threatened by "fragmentation" of their range as well as by direct cutting of their immediate habitat. Sisco testified that cutting in the Wilcox Peak area will further contribute to fragmentation.

The BLM contests the significance of this new evidence. First, it points out that Lande's study has been severely criticized by other experts in the field. For example, another demographics specialist, Dr. Boyce, testified to significant problems with the Lande study—including small sample sizes, reliance upon untested critical assumptions, and questionable estimates of owl population. Boyce, another owl expert, Dr. Irwin, and the BLM's own biologist, Naitro, also discounted Sisco's conclusions

as to the significance of Wilcox Peak as a "critical area" unifying the owls' range. The BLM argues that it properly declined to give weight to the Lande study and the other conclusions proposed by Sisco.

The BLM also contests the significance of the sighting of the pair of breeding northern spotted owls. Irwin concluded that it was speculative that cutting in Wilcox Peak would fatally displace the owls. The owls' tree itself would not be cut, and Irwin stated that this action alone might be sufficient protection. Moreover, Irwin said that the pair might successfully be relocated after the cutting—possibly even in an area not containing old growth forest. Finally, Irwin doubted that displacement of this particular pair would have any significant impact upon the species as a whole. In addition, the BLM emphasized that the EIS and the EA contemplated the possibility of northern spotted owls in the logging area. As explained above, these documents discussed the threat to the northern spotted owls from old growth harvesting such as will occur at Wilcox Peak. Thus, the BLM contends that the sighting does not truly provide significant new information not already accounted for in previous studies. The BLM therefore argues that it was justified in dismissing the significance of the sighting.

Our role is limited to ensuring that the BLM based its decision "on a consideration of the relevant factors" and that it did not commit "a clear error of judgment." *Marsh*, 109 S.Ct. at 1861 (internal quotations and citation omitted). Based upon this limited scope of review, we have little difficulty upholding the BLM decision. The agency was advised of Sisco's testimony, the Lande study, and the owl sighting. However, the BLM credited the conclusions of its own experts in deciding that the additional information was not significant. While the merits of that decision may be fairly debated, we cannot say that the agency committed a "clear error of judgment." An agency is entitled to rely upon the reasonable conclusions of its own experts. *Id.* As in *Marsh*, "having determined based on careful scientific analysis that the new information was of exaggerated importance, the [agency] acted within the dictates of NEPA in concluding that supplementation was unnecessary. Even if another decision-maker might have reached a contrary result, it was surely not 'a clear error of judgment' for the [agency] to have found that the new and accurate information contained in the documents was not significant and that the significant information was not new and accurate." *Id.* at 1865. It was not arbitrary or capricious to conclude that Headwaters's "new" evidence was either not credible, lacking significance, or adequately addressed in the existing statements.

### III

Headwaters next contends that the BLM violated NEPA by failing to consider a range of reasonable alternatives to the logging at Wilcox Peak. NEPA requires a federal agency to give a "detailed statement ... on ... alternatives to the proposed action ..." and to "study, develop, and describe appropriate alternatives...." 42 U.S.C. § 4332(2)(C) and (E); *California v. Block*, 690 F.2d 753, 766 (9th Cir.1982) (*Block*). We review an agency's range of alternatives under a "rule of reason" standard that "requires an agency to set forth only those alternatives necessary to permit a reasoned choice." *Block*, 690 F.2d at 767 (internal quotations and citations omitted).

"[T]he touchstone for our inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *Id.* at 767. Section 4332 does not require the consideration of alternatives "whose effect cannot be reasonably ascertained, and whose implementation is deemed remote and speculative." *Life of the Land v. Brinegar*, 485 F.2d 460, 472 (9th Cir.1973), *cert. denied*, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). Nor must an agency consider alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area. *Block*, 690 F.2d at 767 (consideration of alternatives not responsive to policy objectives of manage-

ment plan need not be considered); *Kilroy v. Ruckelshaus*, 738 F.2d 1448, 1454 (9th Cir.1984) (agency need not consider alternatives "remote from reality"). Finally, NEPA does not require a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences. *Northern Plains Resource Council v. Lujan*, 874 F.2d 661, 666 (9th Cir.1989). Thus, an agency's consideration of alternatives is sufficient if it considers an appropriate range of alternatives, even if it does not consider every available alternative.

■ In this case the EIS considered five alternate management techniques for the Unit. The SEIS considered shelterwood cutting as an alternative to clear-cutting. At the site-specific level, the EA considered four alternatives plus a no-action alternative. The BLM held a public hearing on the Wilcox Peak sale at which interested parties (including members of Headwaters) voiced objections and offered alternatives. Some of these suggestions were adopted; all were considered, although many were not discussed in the EA because they were impractical or beyond the scope of the management plan.

We are satisfied that the BLM gave adequate consideration to reasonable alternatives. While the BLM did not consider some of the specific proposals advanced by Headwaters, it reasonably concluded that these proposals were similar to alternatives actually considered, infeasible, or incompatible with the management objectives for the region.

Headwaters also contends that the range of alternatives was too narrow because the EIS and the EA did not adequately consider a "no action" alternative. The EIS and the EA both presented a "no action" alternative, although they devoted considerably less space to presenting and discussing this option. Headwaters suggests that such brief treatment shows that the option was not considered seriously. However, in *Lyng* we concluded that merely because a "no action" proposal is given a brief discussion does not suggest that it has been

insufficiently addressed. *Lyng*, 882 F.2d at 1423 n. 5 ("The fact that the description of the no-action alternative is shorter than those of the other proposals does not necessarily indicate that the no-action alternative was not considered seriously. It may only reveal that the [agency] believed that the concept of a no-action plan was self-evident while the [other alternatives] needed explanation."). Headwaters points to no evidence that the BLM failed to consider sufficiently a no action alternative at either the regional or the site-specific level.

## IV

■ Headwaters's final argument under NEPA is that the Wilcox Peak EA fails to consider adequately the cumulative impacts of the construction of a logging access road into the area. Headwaters contends that the access road will permit further logging in the area (beyond that contemplated in the Wilcox Peak sale itself), and that the cumulative impacts of this future logging should have been addressed in the EA. "Cumulative impacts" are the collective environmental impacts of all "past, present, and reasonably foreseeable future actions" taking place in the affected area. *Sierra Club v. United States Forest Service*, 843 F.2d 1190, 1194 (9th Cir.1988), *quoting* 42 C.F.R. § 1508.7 (1987).

No evidence has been presented suggesting that any further activities, logging or otherwise, are contemplated by the BLM in connection with the Wilcox Peak access road. The BLM plans to close off the road once the Wilcox Peak cutting is complete. Headwaters argues that plans for further logging can be inferred because the Wilcox Peak sale alone does not require construction of the road. According to Headwaters's expert, harvesting of the Wilcox Peak sale could be accomplished by a sophisticated skyline, cable logging system and by helicopter logging. However, the BLM determined, based on a consideration of conflicting expert opinions, that helicopter logging of the Wilcox Peak area would be economically impractical and potentially injurious to the environment. Whether or not this determination is correct, it demon-

strates that, in the view of the BLM, the decision to build the road is fully justified by the Wilcox Peak sale alone. Thus, we do not conclude that the road implies any (yet-unstated) plan for further development.

Headwaters further argues that the BLM plan encompasses only the next five years, and that the proposed barricades which will be used to close the road could be removed to facilitate logging after that period has expired. While true, this argument reveals the speculative nature of the claim. The Wilcox Peak road could conceivably be used for future logging; on the other hand, it is at least as likely that it will never be so used. Under these circumstances, any future activity is not reasonably foreseeable. Headwaters's assertion amounts to no more than speculation, and as such does not require an SEIS evaluating purely hypothetical cumulative impacts.

## V

Headwaters next contends that the BLM's procedures violate the Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.* (Management Act). The Management Act prescribes management objectives for public domain lands, which constitute a significant portion of the Wilcox Peak sale area. Headwaters charges that the BLM's focus on timber production over other uses (principally wildlife conservation) on these lands is inconsistent with the multiple use principles of the Management Act. *See* 43 U.S.C. §§ 1701(a)(7), 1712(c)(1).

 Under the Management Act, the BLM must inventory the resource values of public domain land and select "that use or combination of uses which will best achieve the objectives of multiple use." 43 C.F.R. § 1725.3–1 (1987); 43 U.S.C. § 1711(a). The BLM is directed "to manage the public lands on a multiple use basis making the most judicious use of the land for some or all of the public land resources and using some land for less than all of the resources, where appropriate. Thus, ... the BLM need not permit all resource uses on a given parcel of land." *Rocky Mountain*

*Oil and Gas Association v. Watt,* 696 F.2d 734, 738 (10th Cir.1982) (*Rocky Mountain Oil*) (emphasis, citations, and internal quotations omitted).

Headwaters does not contend that the BLM cannot favor one use over others on particular tracts of public domain land. Headwaters contends, however, that the BLM must *consider* multiple uses before electing to emphasize one use over others. Thus, Headwaters argues that the BLM cannot manage the Wilcox Peak public domain land for timber production without evaluating alternate uses such as wildlife conservation.

 Here the BLM prepared a multiple use analysis pursuant to the Management Act for the Unit. Although Headwaters contends that the analysis was inadequate, the district judge determined that it was sufficient, and we agree. The district court found that

> [the management plan] for the [Unit] discussed multiple uses. First, BLM specialists studied numerous resources besides timber in the [Unit] and generated optimal management plans for each individual resource. Second, BLM examined all the resources together and generated alternative management plans to minimize the conflicts between the resources. BLM supported each alternative with a rationale and discussion of support needs. Then for each resource, BLM made a multiple use recommendation, suggested alternatives to the recommendation, and discussed the reasons for choosing the recommendation. The analysis considered "all pertinent factors, including, but not limited to, ecology, existing uses, and the relative values of the various resources in particular areas."

District Court opinion, *quoting* 43 C.F.R. § 1725.3–1 (1987). This finding is supported by the language of the management plan and by testimony presented at trial, and is not clearly erroneous. Under the circumstances, the BLM fully complied with the analysis requirements of the Management Act.

After completing the multiple use analysis, the BLM elected to emphasize the production of timber on particular parcels in the Unit while managing over half of the public domain lands in the Unit for non-timber uses. This determination is not inconsistent with the Management Act. *Rocky Mountain Oil*, 696 F.2d at 738 & n. 4. Headwaters argues that the BLM should have prepared a site-specific multiple use analysis for Wilcox Peak. However, no authority suggests that a site-specific analysis is required when the regional plan complies with applicable multiple use requirements. *See id.* (compliance with Management Act should be analyzed at regional rather than site-specific level).

## VI

Headwaters also contends that the BLM has misinterpreted the Oregon and California Sustained Yield (or McNary) Act, 43 U.S.C. § 1181a, *et seq.* (O & C Act). Portions of the Wilcox Peak sale, as former Oregon and California Railroad Company lands, are governed by the provisions of the O & C Act. Headwaters contends that the O & C Act requires the BLM to manage these lands for multiple use, including wildlife conservation, rather than for the dominant use of timber production.

We have previously observed that "[t]he provisions of 43 U.S.C. § 1181a make it clear that the primary use of the [O & C Act] lands is for timber production to be managed in conformity with the provision of sustained yield." *O'Neal v. United States*, 814 F.2d 1285, 1287 (9th Cir.1987); *see also Skoko v. Andrus*, 638 F.2d 1154, 1156 (9th Cir.) (*Skoko*) (The O & C Act "provided that most of the O & C lands would henceforth be managed for sustained-yield timber production."), *cert. denied*, 444 U.S. 927, 100 S.Ct. 266, 62 L.Ed.2d 183 (1979).

While these statements are arguably dicta, we are convinced of their accuracy. 43 U.S.C. § 1181a states that O & C Act lands shall be managed, except as provided in section 1181c of this title [since repealed], for permanent forest production, and *the timber thereon shall be sold, cut, and removed in conformity with the principal* [sic] *of sustained yield* for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facil[i]ties.

(Emphasis added.) Headwaters argues that the phrase "forest production" in section 1181a encompasses not merely timber production, but also conservation values such as preserving the habitat of the northern spotted owl. However, Headwaters's proposed use—exempting certain timber resources from harvesting to serve as wildlife habitat—is inconsistent with the principle of sustained yield. As the statute clearly envisions sustained yield harvesting of O & C Act lands, we conclude that Headwaters's construction is untenable. There is no indication that Congress intended "forest" to mean anything beyond an aggregation of timber resources.

Nor does the legislative history support Headwaters's reading. The purposes of the O & C Act were twofold. First, the O & C Act was intended to provide the counties in which O & C Act land was located with the stream of revenue which had been promised but not delivered by the Chamberlain–Ferris Revestment Act, 39 Stat. 218 (1916). *See Skoko*, 638 F.2d at 1156. The counties had failed to derive appreciable revenue from the Chamberlain–Ferris Act primarily because the lands in question were not managed so as to provide a significant revenue stream; the O & C Act sought to change this. *Id.* Second, the O & C Act intended to halt previous practices of clear-cutting without reforestation, which was leading to a depletion of forest resources.

All land classified as timber in character will continue in Federal ownership and be managed for permanent forest production on what is commonly known as a sustained-yield basis. Under such a plan the amount of timber which may be cut is limited to a volume not exceeding new growth, thereby avoiding depletion of the forest capital. This type of management

will make for a more permanent type of community, contribute to the economic stability of local dependent industries, protect watersheds, and aid in regulating streamflow.

H.R.Rep. No. 1119, 75th Cong., 1st Sess. 2 (1937). This report concludes that the O & C Act "establishes a vast, self-sustaining timber reservoir for the future." *Id.* at 4.

It is entirely consistent with these goals to conclude that the O & C Act envisions timber production as a dominant use, and that Congress intended to use "forest production" and "timber production" synonymously. Nowhere does the legislative history suggest that wildlife habitat conservation or conservation of old growth forest is a goal on a par with timber production, or indeed that it is a goal of the O & C Act at all. The BLM did not err in construing the O & C Act as establishing timber production as the dominant use.

## VII

Finally, Headwaters argues that the district court erred in permitting the Association of O & C Counties to intervene in this action. However, Headwaters identifies no prejudice stemming from the allegedly improper intervention. Therefore, there can be no reversible error.

AFFIRMED.

FERGUSON, Circuit Judge, dissenting:

For some reason which is a mystery, the majority has agreed to laboriously prepare and publish an opinion which, although favorable to the government, the government has told us that it does not want.[1] All that is accomplished is a waste of judicial resources at a time when those resources are at a premium.

But the waste of the resources is just beginning. As day follows night, the plaintiffs will file a petition for rehearing and a suggestion for en banc review. Then all the active judges of this court and one senior judge will be involved in that process. It borders on the unbelievable how burdensome the judicial process can become when a panel files an opinion based upon facts and law which everyone knows have changed.

On June 22, 1990 the United States Fish and Wildlife Service ("the Service") listed the northern spotted owl as a "threatened species" pursuant to the Endangered Spe-

---

1. On July 31, 1990, Martin W. Matzen of the Environment and Natural Resources Division of the Department of Justice sent the court a letter, the body of which reads as follows:

 I write pursuant to Fed.R.App.P. 28(j) to inform the Court of certain developments subsequent to the submission of this appeal to the Panel (comprised of Circuit Judges Wallace, Ferguson, and Brunetti) following the oral argument held March 9, 1990. These developments have the potential to moot this case, which involves plaintiff's challenge to the Wilcox Peak Timber Sale awarded by the Bureau of Land Management ("BLM") to the Croman Corporation in October 1988.

 On June 22, 1990, the United States Fish & Wildlife Service ("FWS") listed the northern spotted owl as a threatened species pursuant to the Endangered Species Act, 16 U.S.C. 1531 et seq. ("ESA"). See 55 Fed.Reg. 26114 (June 26, 1990).

 On July 11, 1990, in response to the owl's listing as a species protected by the ESA, the BLM requested a formal conference with the FWS in accordance with Section 7(a) of the ESA, 16 U.S.C. 1536(a), with respect to six timber sales which have active spotted owl sites within the areas of the sales contracts.

 (See Attachment A, the July 11 memorandum from BLM to FWS.) The Wilcox Peak Timber Sale at issue in this litigation is one of those sales which may adversely affect the owls within the area of its contract. As a result of the consultation with the FWS, the Sale may be modified, or even cancelled, by the BLM.

 To preserve the status quo at the sale site pending consultation, the BLM has suspended all operations at the Wilcox Peak site, effective July 23, 1990. (See Attachment B, the July 19 letter from BLM to Croman Corporation). We are informed that Croman had not yet begun to harvest this sale site.

 Because these actions have the potential to culminate in administrative action which could moot this case, the Court should be aware of the foregoing developments. While final administrative action on this Sale may be some months distant, we shall promptly inform the Court of the BLM's subsequent actions in this regard for so long as this case remains pending.

 I enclose three (3) copies of this letter for distribution to the Panel before which this appeal is under submission. A copy of this letter has today been served by mail upon all other counsel of record in this appeal.

cies Act, 16 U.S.C. 1531 *et seq.* ("the Act"). *See* 55 Fed.Reg. 26114 (June 26, 1990).

In its description of the background to this decision, the Service explained that in 1987 it had denied petitions for such listing, but in response to a Sierra Club suit challenging that decision, the Service initiated a new "in-depth review" of the issue on December 5, 1988.

> After reviewing the 1987 administrative record, the Service concluded that *there was considerable new information available* that had not been present in the original record.... On April 25, 1989, the Regional Director issued a revised petition finding indicating that listing the northern spotted owl as a threatened species throughout its entire range was warranted and that the Service would promptly pursue the listing process for the species.

55 Fed.Reg. at 26118 (emphasis added).

Pursuant to Section 41 of the Act, the Bureau of Land Management ("BLM"), in a July 16, 1990 letter to the Cromon Corporation, a copy of which was forwarded to this panel, ordered the entire contract for the Wilcox Peak area at issue in this litigation suspended pending administrative consultation, because of the presence of northern spotted owls. The order reads:

> The purchaser shall immediately discontinue specified construction or timber harvesting operations ... [since] sensitive, threatened, or endangered plants or animals protected under the Endangered Species Act of 1973 have been discovered to be present on the area. Discontinued operations may be resumed upon receipt of written instructions and authorization by the Authorized Officer.

The U.S. District Court for the district of Oregon has already acknowledged that the decision to list the northern spotted owl as "threatened" "substantially affects" the legality of sales of old-growth forests. *Gifford Pinchot Alliance, et al. v. Butruille, et al.*, 742 F.Supp. 1077 (D.Or.1990).

Clearly the Service no longer adheres to those views put forward by BLM regional personnel in the Wilcox Peak litigation. One striking example is testimony cited by the majority opinion alleging that deforestation of an area of old-growth forest, excepting a single tree where a pair of spotted owls live, might not affect the owls' survival: if the owls' nesting "tree itself would not be cut ... this action alone might be sufficient protection" to preserve the pair. (Majority opinion at 1177). This view is irreconcilable with the Service's current analysis:

> There is no evidence that commercially managed tracts alone will provide all the attributes required by spotted owls. Although studies on private land in California indicate that stands managed using uneven-aged methods often continue to support owl populations or support them at earlier ages than if the stands had been clearcut, it also is clear that stands less than 80 years of age seldom provide suitable habitat for northern spotted owls. Further, northern spotted owls are rare or absent where less than 20 percent of the region is suitable habitat.... Once stands more than 80 years old have been harvested it is improbable that these areas will support spotted owls.... Further, analysis indicates that owl productivity per pair was lowest in areas with little older forest; hence, this suggests that even if some owls persist in these areas, it is probable that their productivity rate would be insufficient to maintain the population long-term. The Service maintains that it is extremely unlikely given current and anticipated management strategies for commercial forest lands, that these lands will provide a significant amount of suitable northern spotted owl habitat.

55 Fed.Reg. 26155 (citations omitted).

It is our responsibility to take judicial notice of these decisions. *See, e.g., Thornton v. United States*, 271 U.S. 414, 420, 46 S.Ct. 585, 586, 70 L.Ed. 1013 (1926); 10 *J. Moore, Federal Practice*, § 201.02[1] (1988). But the majority opinion ignores these events and analyses and would affirm a district court decision reached before the spotted owl was listed as threatened, a course needlessly burdensome to the parties and this court. We should re-

mand to the district court for reconsideration in light of the northern spotted owl's listing as a threatened species.